PEOPLE v ALEXANDER

1. CRIMINAL LAW—MOTIONS—MISTRIALS—PROSECUTORS—APPEAL AND
    ERROR.
    A defendant's motion for a mistrial, alleging reversible error
    because of alleged improper questioning of the defendant by
    the prosecution regarding his knowledge concerning the source
    of the gun used in a homicide, was properly denied where: (1)
    defense counsel promptly objected, (2) the objection was sus-
    tained, (3) the question went unanswered by the defendant, (4)
    the trial judge promptly cautioned the jury to disregard the
    question, and (5) the question can be characterized as a good
    faith attempt to test the defendant's memory and credibility
    rather than interject prejudicial and inadmissible matters into
    the trial; the defendant should not be heard to complain where
    the alleged error was compounded by his attorney's inaccurate
    characterization of the prosecutor's question.

2. APPEAL AND ERROR—JUDGES—DISQUALIFICATION OF JUDGES.
    The consideration of a disqualification claim against a trial judge
    is precluded on appeal where the claim was not raised at the
    time of trial and the basis for such disqualification was known
    before the trial.

3. JUDGES—RIGHTS TO HEAR CASES.
    A trial judge has the right to hear a case to its conclusion absent
    a showing from the record of actual prejudice, bias, or miscon-
    duct.

4. HOMICIDE—FIRST-DEGREE MURDER—MANSLAUGHTER—GUILTY PLEA
    —PREJUDICIAL ERROR—REVERSIBLE ERROR—GUILTY PLEAS BY
    ACCOMPLICES.
    Prejudicial error sufficient to constitute reversible error is not

REFERENCES FOR POINTS IN HEADNOTES
[1] 76 Am Jur 2d, Trial §§ 1078–1089.
[2] 46 Am Jur 2d, Judges §§ 94–96.
[3] 46 Am Jur 2d, Judges §§ 166–179.
[4] 21 Am Jur 2d, Criminal Law §§ 494–496.
[5] 81 Am Jur 2d, Witnesses §§ 518–520.
[6] 81 Am Jur 2d, Witnesses §§ 522, 560.
[7] 75 Am Jur 2d, Trial §§ 335, 413–426.
[8] 40 Am Jur 2d, Homicide § 439.

shown when the prosecution, in a trial for first-degree murder, revealed that the defendant's wife had pled guilty to a reduced charge of manslaughter where: (1) the fact of the guilty plea was revealed in the course of proper impeachment on a material point, (2) defense counsel failed to object, (3) defense counsel had already revealed, for all practical purposes, that she had been convicted through his questioning of her, and (4) defense counsel emphasized her conviction by continuing to question her once the fact of her conviction had been divulged.

5. WITNESSES—IMPEACHMENT—APPEAL AND ERROR.

Failure to object to the allegedly improper impeachment of a witness precludes review, absent manifest injustice.

6. CRIMINAL LAW—ACCOMPLICES—GUILTY PLEA—IMPEACHMENT—REVERSIBLE ERROR.

Mere revelation of the fact that an accomplice has pled guilty in the course of impeaching the accomplice's testimony does not necessarily entitle a defendant to the reversal of his conviction.

7. CRIMINAL LAW—QUESTIONS OF FACT—PROSECUTORS—OTHER DEFENDANT'S GUILTY PLEAS.

It is a question of fact whether a prosecuting attorney's disclosure during trial that another defendant has pleaded guilty is prejudicial to the defendant on trial; prejudice results only where, in light of all the circumstances attendant upon a trial, the misconduct complained of can be said to have influenced the jury's verdict and prevented a fair trial.

8. HOMICIDE—FIRST-DEGREE MURDER—EVIDENCE—PREMEDITATION—DELIBERATION—SUFFICIENCY OF EVIDENCE.

Evidence of premeditation and deliberation is sufficient to warrant the submission of a charge of first-degree murder to a jury where the evidence indicates that: (1) the time span between the initial homicidal intent and the ultimate action afforded the defendant a chance to subject the nature of his initial response to a second look, (2) the defendant acquired or positioned his weapon with the thought beforehand to kill the deceased, and (3) the testimony concerning the defendant's conduct leading up to and after the shooting can be regarded as reflecting a coherent plan deliberated and premeditated before the homicide.

Appeal from Oakland, Farrell E. Roberts, J. Submitted April 5, 1977, at Lansing. (Docket No. 26545.) Decided June 6, 1977. Leave to appeal applied for.

Ernest Alexander was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *James L. McCarthy,* Assistant Appellate Counsel, for plaintiff.

*Charles Burke,* for defendant.

Before: Bronson, P. J., and M. F. Cavanagh and C. J. Byrns,* JJ.

C. J. Byrns, J. Defendant was convicted of first-degree murder[1] by a jury and now appeals by right.

The homicide occurred at Hazel Park Race Track, on June 13, 1975. Defendant went there to collect his pregnant wife, who had gone, unaccompanied, to watch the races. He spied her from a distance under the grandstand, where she was watching for the results of the last race, just as the victim, John Sweden, approached her and began talking to her. Defendant approached them, words were exchanged between defendant and Sweden, and the words led to blows. It is unclear who struck the first blow, but from all the testimony it appears that Sweden knocked defendant down two or three times, and that defendant had the worst of the fray.[2] At one point, one of Sweden's companions intervened, but it is unclear whether he joined Sweden in beating defendant while he was down, as defendant and his wife

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] MCLA 750.316; MSA 28.548.

[2] Defendant lost part of a tooth and at the time of trial he testified that he still bore bruises inflicted during the encounter.

testified, or whether he was merely trying to restrain Mrs. Alexander, who, it was undisputed, beat her husband's assailant with her purse.

Sweden's two companions testified that before defendant finally fled from the scene of the fight he turned, shook his finger at Sweden, and shouted, "Be here when I come back", or, "Just give me one minute". This testimony was corroborated by three witnesses unrelated to either the victim or defendant.[3] Defendant and Mrs. Alexander denied recalling that defendant uttered such a threat, although defendant conceded on cross-examination that he was angry and "might have".

Defendant and Mrs. Alexander denied that she left the grandstand area with defendant after the fight. Defendant maintained that he left the grandstand area to get the loaded revolver that he kept in the trunk of his car with the intention of using it to protect himself and his wife when he returned to rescue her. Sweden's companions did not testify on this point, but two other witnesses testified that defendant and his wife left the grandstand area together. Defendant's wife testified that she stayed behind when defendant fled, but could not explain how she came to be standing behind defendant at the time of the shooting without having passed Sweden and his companions, who left the grandstand area after the fight and proceeded toward the parking lot.

It is unclear exactly where the shooting occurred, but all the witnesses agreed that it was somewhere in the vicinity of the boulevard separating

---

[3] Witness Ann Clayton testified that defendant pointed his finger at Sweden and said, "Wait a minute," or "Just wait till I come back." Witness Willie Ann Norris testified that defendant stopped at the door and shouted "that he was gonna get the big guy". Witness Ophelia Walker testified that defendant shouted, "You wait, you son of a bitch, you wait and then I'll be back".

the grandstand area from the parking lot. As Sweden and his companions were walking toward the parking area, defendant and his wife ran up, defendant shook the gun in Sweden's direction, and said, "Hey, what you gonna do now?" Defendant denied making this statement, but he did not deny shooting Sweden twice in the chest, allegedly acting in self-defense as Sweden advanced toward defendant after defendant had warned him to stop.

According to Sweden's companions, Mrs. Alexander pounded on defendant's back and shouted, "Shoot him, Ernest, shoot him", immediately before defendant fired. Mrs. Alexander denied saying this. She testified that she said, "Look out, Ernest".

Defendant estimated that "maybe a minute" passed between the time he fled from the grandstand area and the time of the shooting. Sweden's two companions estimated the period between defendant's "Be here when I get back" statement and his "Hey, what you gonna do now?" statement at from three to five or four to five minutes. Witness Ophelia Walker testified that she heard gunshots two or three minutes after defendant's threat.

Witness Donald Smith testified that after hearing two shots he saw defendant and his wife walk "nonchalantly" away from Sweden's body, talking as they proceeded toward the parking lot. Defendant handed the gun to his wife, who put it in her purse, and then they separated. Defendant proceeded at a "lope" toward Ten Mile Road while his wife ran to the car. Smith wrote down the license number on a newspaper and related it to a police officer at the scene who broadcast it. Two patrolmen spotted defendant's car on Ten Mile Road and began following it. One of them, Officer Sanders,

testified that as they drew up beside defendant's car near the intersection of Tawas and Ten Mile he saw a flicker of movement. Fearing that defendant was about to open fire, the officers dropped back and waited for assistance before stopping defendant's car. Defendant's gun was subsequently recovered near the intersection of Tawas and Ten Mile, and ballistics tests confirmed that it was the murder weapon.

Officer Sanders testified that when he advised defendant that he was under arrest for attempted murder, defendant responded, "I know".

On appeal, defendant's appellate counsel has raised a single claim of error, and defendant, by way of supplemental briefs filed *in propria persona,* has raised three additional claims of error.

The first claim of error concerns a question posed to defendant by the prosecutor on cross-examination. On direct examination defendant testified that he purchased the gun in Detroit in March, 1975, after being held up, and that he had kept it in his trunk ever since. On cross-examination defendant repeated his testimony that he had kept the gun in his trunk since March, whereupon the prosecutor asked defendant if it would "surprise [him] to know that this particular gun was reported taken in a holdup in Detroit on April 13, 1975".

Defendant now contends that the question was so prejudicial as to warrant reversal, even though defense counsel's prompt objection was sustained, the question went unanswered, and the trial judge cautioned the jury to disregard the question. Defendant claims that the trial judge should have granted defendant's motion for a mistrial. We disagree. This case presents a situation quite unlike that in *People v Brocato,* 17 Mich App 277,

291; 169 NW2d 483 (1969), relied upon by defendant, in which the prosecutor "made every conceivable effort to prevent the defendant from having a fair trial" by repeatedly engaging in blatant acts of misconduct. In the present case, we perceive the prosecutor's question as an attempt to test defendant's memory and credibility, *People v Alphus Harris,* 56 Mich App 517, 530–531; 224 NW2d 680 (1974), rather than as an attempt to inject prejudicial and inadmissible matters into the trial. *People v Gregory Williams,* 57 Mich App 521; 226 NW2d 547 (1975).

In addition, we believe that the trial judge's action in sustaining defense counsel's objection to the question before it was answered and in promptly cautioning the jury to disregard the question cured any error the prosecutor may have committed. *People v Jack,* 61 Mich App 638, 639; 233 NW2d 120 (1975). Accordingly, denial of defendant's motion for mistrial was proper.

Finally, we note that during his closing argument defense counsel compounded any error the prosecutor may have committed by inaccurately[4] characterizing the prosecutor's question. Since the prosecutor's question appears to have been posed in a good faith attempt to impeach defendant's credibility, and since the trial judge promptly corrected any error that may have arisen, defendant should not be heard to complain when the prejudice alleged was aggravated by his own attorney's closing argument. See *People v Clark,* 63

---

[4] The prosecutor merely asked whether defendant would be surprised to learn that the gun had been *taken* in a holdup *after* defendant claimed to have purchased it and stored it in his trunk. If true, this would merely tend to show that defendant's testimony on that point was not credible. In his closing argument, however, defense counsel criticized the prosecutor for asking defendant if he knew the gun "was in a holdup", asking, rhetorically, "How low can you get? Bringing something else in here".

Mich App 334, 338; 234 NW2d 511 (1975), *People v Jelks,* 33 Mich App 425, 431; 190 NW2d 291 (1971).

Defendant raises three claims in his supplemental briefs. His first contention, that the trial judge who presided at defendant's jury trial should have been disqualified because he accepted Mrs. Alexander's guilty plea, is without merit. Consideration of a disqualification claim not raised at the time of trial is precluded when the basis for such disqualification was known before the trial. *People v Dudley,* 393 Mich 762; 223 NW2d 297 (1974). We note also that the reasoning of *People v Chesbro,* 300 Mich 720, 723–724; 2 NW2d 895 (1942), is applicable to this case. Absent a showing of actual prejudice, bias, or misconduct from the record, a trial judge has the right to hear a case to its conclusion. *People v Irwin,* 47 Mich App 608; 209 NW2d 718 (1973), see *People v Grable,* 57 Mich App 184; 225 NW2d 724 (1974). Defendant's concession that he "does not in any way suggest that the trial judge in this was anything but fair and impartial" is confirmed by our complete review of the transcript of the proceedings below, and accordingly we find no error.

Defendant next contends that reversible error occurred when the prosecutor revealed that Mrs. Alexander had been convicted on her plea of guilty to a reduced charge of manslaughter in connection with this case. This occurred after Mrs. Alexander reiterated on cross-examination her testimony on direct examination that she had merely warned defendant to "look out". The prosecutor questioned Mrs. Alexander closely on this point, asking her if she was absolutely sure that she had not said, "Shoot him, Ernest, shoot him". After Mrs. Alexander denied saying that, and without defense objection, the prosecutor called in rebuttal the

court reporter who recorded Mrs. Alexander's guilty plea and impeached Mrs. Alexander's testimony with that of the court reporter, who testified that when asked by the judge whether she had told defendant to shoot Sweden, Mrs. Alexander had answered "yes".

Initially, we note three factors that enter into our decision. First, defense counsel failed to object to any of the questions posed to Mrs. Alexander on cross-examination and also failed to object to the court reporter's impeachment testimony. In the absence of manifest injustice, failure to object to allegedly improper impeachment precludes review. *People v St Onge,* 63 Mich App 16, 19; 233 NW2d 874 (1975).

Secondly, defense counsel had already revealed, for all practical purposes, that Mrs. Alexander had been convicted as a result of her participation in this matter, by repeatedly asking whether she had been convicted "previous to this case".

Thirdly, once the fact of Mrs. Alexander's conviction had been divulged, defense counsel chose to question Mrs. Alexander as to why she had pled guilty, thus emphasizing that fact. Mrs. Alexander explained that she had been guaranteed probation and had not wanted to risk being convicted and separated from her baby by going to trial.

Additionally, we note that the prosecutor only alluded to Mrs. Alexander's guilty plea in the course of laying a foundation for impeaching her testimony, that she had not urged defendant to shoot the victim, with her statements at the plea-taking. The questions posed by the prosecutor were necessary to comply with the foundation requirements set forth in *People v Graves,* 15 Mich App 244; 166 NW2d 480 (1968). In this case apparently no transcript of the plea-taking was

available for use in impeaching Mrs. Alexander, and the court reporter had to be called so as to enable her to testify from her notes.

Mere revelation of the fact that an accomplice has pled guilty in the course of impeaching the accomplice's testimony does not necessarily entitle a defendant to reversal. See *People v St Onge, supra, People v Woodfork,* 29 Mich App 633; 185 NW2d 826 (1971), *People v Marra,* 27 Mich App 1, 8; 183 NW2d 418 (1970). In the present case, the fact of Mrs. Alexander's guilty plea was revealed in the course of proper impeachment of her testimony on a material point by use of her prior inconsistent statement at the guilty plea proceeding. See *People v Coates,* 40 Mich App 212; 198 NW2d 837 (1972). Mrs. Alexander's testimony that she did not urge defendant to shoot his victim was material to the issue being tried, *viz.* whether defendant acted with premeditation and deliberation, and thus the prosecutor did not improperly impeach Mrs. Alexander upon testimony collateral to the issue being tried. See *People v McGillen #1,* 392 Mich 251, 265–268; 220 NW2d 677 (1974).

In view of the foregoing, this case is distinguishable from those in which the prosecutor deliberately injected evidence of a codefendant's or accomplice's guilty plea in an improper attempt to prejudice the defendant, see *e.g., People v Brocato,* supra, *People v Eldridge,* 17 Mich App 306; 169 NW2d 497 (1969), or in which the fact that an accomplice has pled guilty is revealed to the jury in the course of ruling on a self-incrimination claim. See *People v Brown,* 44 Mich App 402; 205 NW2d 207 (1973).

" 'Whether [a prosecuting attorney's disclosure during trial that another defendant has pleaded guilty] was prejudicial is a question of fact, and, in the final analy-

sis, each case must be determined on its own particular facts, for there is no legal standard by which the prejudicial qualities of a prosecuting attorney's remarks or conduct can be gauged, and it is only when, in the light of all the circumstances attendant upon a trial, the misconduct complained of can be said to have influenced the jury's verdict and prevented a fair trial, that prejudice results.' " *People v Eldridge, supra,* at 317.

In the present case, the fact of Mrs. Alexander's guilty plea was revealed in the course of proper impeachment and without defense objection. Defense counsel had previously implied that she had been convicted in connection with this case, and he further emphasized the guilty plea by questioning Mrs. Alexander concerning her reasons for tendering her plea. Under these circumstances, we hold that it was not so prejudicial as to constitute reversible error for the prosecutor, in the course of impeaching her testimony on a material point, to divulge the fact that Mrs. Alexander had pled guilty, particularly in view of the overwhelming evidence against defendant. See *People v Woodfork, supra.*

Finally, defendant contends that there was insufficient evidence to warrant submission of the charge of first-degree murder to the jury. Defendant argues that the testimony shows that the homicide was committed in the heat of passion, after great provocation by the victim. Although defendant may have been humiliated by the beating inflicted upon him by the victim, and may even have been enraged when he fired the fatal shots, we are unable to say, as a matter of law, that there was insufficient evidence to warrant submission of the first-degree murder charge to the jury.

Indeed, the above statement of facts, culled from a careful and thorough review of the entire transcript, contains more than sufficient evidence of premeditation and deliberation to warrant submission of the question to the jury.

First, five witnesses testified that defendant uttered a threat before leaving the grandstand area. The witnesses variously estimated that, between defendant's threat and the shooting, one minute (defendant), two or three minutes (Ophelia Walker), three to five minutes or four to five minutes (Sweden's companions) elapsed. It is only necessary that there be "Some time span between initial homicidal intent", as evidenced in this case by defendant's threat, "and ultimate action * * * to establish premeditation and deliberation". *People v Hoffmeister,* 394 Mich 155, 161; 229 NW2d 305 (1975), *People v Bargy,* 71 Mich App 609, 613; 248 NW2d 636 (1976). This case is thus unlike *People v Vail,* 393 Mich 460, 471; 227 NW2d 535 (1975), in which all witnesses but one, whose testimony was self-contradictory, testified that defendant's shot was fired almost simultaneously with that of his victim. We cannot say that the time interval was insufficient to afford defendant a chance to subject the nature of his initial response to a "second look". *People v Morrin,* 31 Mich App 301, 330; 187 NW2d 434 (1971), see *People v Berthiaume,* 59 Mich App 451; 229 NW2d 497 (1975).

Secondly, in this case, there was abundant evidence that defendant "acquired or positioned" his weapon with the thought beforehand to kill Sweden. Defendant had ample motive to do so, having lately received a beating from Sweden, and, after uttering his threat, defendant returned to his car, opened the trunk, took out a loaded revolver and

went off in search of Sweden. This case is thus distinguishable from *People v Morrin, supra,* in which defendant used "an apparently impromptu weapon", a tool of his trade immediately at hand. See *People v Berthiaume, supra,* at 459.

Finally, the testimony concerning defendant's conduct leading up to and after the shooting can be regarded as reflecting a coherent plan deliberated and premeditated before the homicide. *People v Morrin, supra,* at 332. There was testimony that defendant and his wife left the grandstand area together after defendant uttered his threat; that after defendant returned to the car, got his gun, and spotted Sweden, he asked his victim "What you gonna do now?"; that Mrs. Alexander encouraged defendant to shoot; that after the shooting defendant and his wife walked "nonchalantly" away from Sweden's body while talking; that defendant handed the gun to his wife, who put it in her purse before they separated; that defendant then "loped" out to the highway, where he rejoined his wife after she had negotiated the congested parking area in their car; and that defendant threw away the weapon before he was apprehended. When told that he was under arrest for attempted murder, defendant replied, "I know". This case is thus quite unlike *People v Oster,* 67 Mich App 490; 241 NW2d 260 (1976), in which the only evidence suggesting a plan or scheme to kill were the facts that defendant had carried a knife long before the stabbing and that he cleaned the knife afterwards. Defendant's conduct in this case was "coherent * * * [and] organized enough to suggest [that] it occupied a place in a scheme or plan deliberated and premeditated upon before the homicide". *People v Morrin, supra,* at 332, *People v Fields,* 64 Mich App 166, 169; 235 NW2d 95

(1975) (defendant told his victim he "would be back").

We are constrained to conclude that there was no error in submitting the charge of first-degree murder to the jury, and we therefore decline to disturb its verdict. Although we can feel a degree of sympathy for defendant, who committed this murder after receiving a severe beating at the hands of the man who had accosted his pregnant wife, we cannot say that the jury was wrong. We note that defendant parked his car next to the race track police post, and observe that he would be a free man today if he had gone there for assistance after receiving the beating instead of taking the law—and his gun—in his hands.

Affirmed.