## PEOPLE v RICHARDSON

Docket No. 60406. Argued January 8, 1980 (Calendar No. 4).—Decided
June 24, 1980.

Jesse J. Richardson, Jr., was convicted by a jury in Recorder's
Court of Detroit, John P. O'Brien, J., of first-degree murder.
The judge instructed the jury on first-degree murder, second-
degree murder, and voluntary manslaughter, but refused the
defendant's request that he instruct on involuntary manslaugh-
ter and reckless use of a firearm causing death or injury. The
Court of Appeals, V. J. Brennan, P.J., and Walsh and J. N.
O'Brien, JJ., held that the jury should have been instructed on
the offenses requested, but that the error was harmless in view
of the jury's refusal to convict on the lesser offenses for which
instructions were given (Docket No. 25340). The defendant
appeals. In a unanimous opinion by Justice Ryan, the Supreme
Court *held:*

1. Where there is a request to charge on a lesser offense
which is not a necessarily included offense, if evidence has been
presented which would support conviction of a lesser offense,
refusal to give the requested instruction is error. In this case
the defense offered, in differing measures, ingredients of provo-
cation, accident, self-defense, and "criminal" negligence of the
kind that attends involuntary manslaughter. There was evi-
dence presented which would have supported a conviction of
involuntary manslaughter or of reckless use of a firearm caus-
ing death, and the trial judge erred in refusing to instruct on
these lesser offenses.

2. The next question is whether the kind of error which
occurred can be rendered harmless by the verdict of guilty on a
higher offense where the option was available to convict on
some lesser offense. In this case it is unnecessary to decide
whether the harmless error principle can be applied generally

REFERENCES FOR POINTS IN HEADNOTES
[1, 3-5] 75 Am Jur 2d, Trial §§ 876, 877.
[2] 40 Am Jur 2d, Homicide § 70.
[3, 5] 40 Am Jur 2d, Homicide §§ 530, 531.
[4, 5] 40 Am Jur 2d, Homicide §§ 94, 95.
[6-8] 40 Am Jur 2d, Homicide § 509.

to cases of that kind because, even if the error could be harmless in some cases, it was clearly prejudicial here. The defendant's testimony, and his case generally, attempted to demonstrate that the death was the result of the accidental discharge of a firearm. The evidence would have supported a finding by the jury that the fatal shot was the result of the defendant's careless, reckless, or negligent, but not wilful or wanton, mishandling of a rifle. Alternatively, there was evidence which would have supported a finding that the defendant's direct acts were not intended to produce serious bodily harm or that the death resulted from the defendant's criminal negligence. The three offenses on which the jury was instructed all involve activity which includes an intent to do great bodily harm or cause death. The offenses on which the request to instruct was denied involve conduct which is careless, reckless, or criminally negligent, and results in injury or death. The effect of the refusal to instruct was to foreclose the jury's option to convict the defendant in accordance with his own testimony, evidence, and theory. Under these circumstances, the refusal to give properly requested lesser included offense instructions was prejudicial error and requires reversal.

3. Another error occurred which the Court addressed to prevent its repetition on retrial. A part of the instructions stated that the law implies malice from the unprovoked, unjustifiable, or inexcusable killing, or when a man kills another suddenly and without provocation. The law does not imply malice from a sudden and unprovoked killing, and it was error so to instruct. The necessary factual element of malice may be inferred from the facts and circumstances of the killing, but it can never be established as a matter of law by proof of other facts. The error was especially prejudicial in this case, because the defendant's evidence and theory included notions of accident, and even if the jury had chosen to accept much of the defendant's version, they might have convicted the defendant of murder because the evidence established a sudden and unprovoked killing which, according to the instructions, was murder.

4. The error was compounded by the immediately subsequent statement that the intention to kill in the absence of evidence showing a contrary intent may be inferred from the use of a deadly weapon. Such an instruction potentially shifts the burden of proof from the prosecution to the defendant on the question of intent. The main issue at trial was the defendant's state of mind, his intent. There was no controversy that the killing arose out of the use of a deadly weapon by the defendant, and little controversy that the killing was sudden and

unprovoked. The instructions, independently and in combination, had the potential of substantially diluting, and to some extent shifting, the prosecution's burden of proof beyond a reasonable doubt on the issue of malice and intent to which the defendant's case was almost entirely directed. Upon review of the record, the Court is unable to say that the instructions were harmless error, and the defendant's conviction is reversed on this additional ground.

Reversed and remanded.

77 Mich App 411; 258 NW2d 741 (1977) reversed.

1. CRIMINAL LAW — LESSER OFFENSES — INSTRUCTIONS TO JURY.

If evidence has been presented which would support conviction of a lesser offense than that charged, refusal to give an instruction to the jury on the lesser offense where there has been a request for such an instruction is error.

2. HOMICIDE — INVOLUNTARY MANSLAUGHTER — ELEMENTS OF CRIME.

Involuntary manslaughter is the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty; the usual situations are when death results either from a direct act not intended to produce serious bodily harm, or from criminal negligence (MCL 750.321; MSA 28.553).

3. HOMICIDE — LESSER OFFENSES — INVOLUNTARY MANSLAUGHTER — INSTRUCTIONS TO JURY.

Refusal, in a prosecution for first-degree murder, of a request to instruct the jury on the lesser offense of involuntary manslaughter was error where the defense case offered, in differing measures, ingredients of provocation, accident, self-defense, and criminal negligence of the kind that attends involuntary manslaughter and the evidence presented would have supported a conviction of involuntary manslaughter (MCL 750.316, 750.321; MSA 28.548, 28.553).

4. HOMICIDE — LESSER OFFENSES — RECKLESS USE OF FIREARM — INSTRUCTIONS TO JURY.

Refusal, in a prosecution for first-degree murder, of a request to instruct the jury on the lesser offense of reckless use of a firearm was error where there was evidence presented which would have supported conviction of reckless use of a firearm (MCL 750.316, 752.861; MSA 28.548, 28.436[21]).

5. HOMICIDE — LESSER OFFENSES — INSTRUCTIONS TO JURY.

Error of the trial court in refusing requests to instruct the jury on involuntary manslaughter and reckless use of a firearm in a prosecution for first-degree murder was prejudicial and requires reversal in a case where the defense presented evidence that a fatal shooting was the result of the defendant's careless, reckless, or negligent, but not wilful or wanton, mishandling of a rifle, and evidence that the defendant's direct acts were not intended to produce serious bodily harm or that death resulted from the defendant's criminal negligence, and where the three offenses on which instructions were given all involve activity which includes an intent to do great bodily harm or cause death, because the jury was deprived of the option to convict the defendant in accordance with his own testimony, evidence, and theory (MCL 750.316, 750.321, 752.861; MSA 28.548, 28.553, 28.436[21]).

6. HOMICIDE — MALICE — INSTRUCTIONS TO JURY.

An instruction to the jury in a prosecution for murder that the law implies malice from an unprovoked, unjustifiable, or inexcusable killing or when a man kills another suddenly and without provocation is erroneous; the necessary factual element of malice may be inferred from the facts and circumstances of the killing, but it can never be established as a matter of law by proof of other facts (MCL 750.316; MSA 28.548).

7. HOMICIDE — MALICE — INSTRUCTIONS TO JURY.

An erroneous instruction to the jury in a prosecution for murder that the law implies malice from an unprovoked, unjustifiable, or inexcusable killing or when a man kills another suddenly and without provocation was especially prejudicial in a case where the defendant's evidence and theory included notions of accident, that the sudden and unprovoked killing was also unintended and accidental, because even if the jury had chosen to accept much of the defendant's version, they might have convicted the defendant of murder because the evidence established a sudden and unprovoked killing which, according to the instructions, was murder (MCL 750.316; MSA 28.548).

8. HOMICIDE — MALICE — INFERENCES — INSTRUCTIONS TO JURY.

An instruction to the jury in a prosecution for murder that the intention to kill, in the absence of evidence showing a contrary intent, may be inferred from the use of a deadly weapon is erroneous because it may be interpreted by the jury as shifting

the burden of proof from the prosecution to the defendant to prove lack of intent (MCL 750.316; MSA 28.548).

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Frank J. Bernacki,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender, by *Peter Jon Van Hoek* and *Barbara Levine,* Assistant Defenders, for the defendant.

RYAN, J. We granted leave to appeal in this case to consider a number of issues, including whether a trial judge's refusal to give a properly requested lesser included offense instruction is harmless error in a case where the jury was instructed on some other lesser offenses and returned a verdict of guilty on a higher, charged offense.

Our review of the record reveals two errors which require reversal of the defendant's conviction and remand for a new trial. First, on the record evidence in this case, the defendant was entitled to have the jury instructed on the lesser offenses of involuntary manslaughter[1] and reckless use of a firearm causing death or injury.[2] The refusal to give instructions on those properly requested and applicable lesser offenses was, in this case, prejudicial error. Second, the trial judge's instructions on the element of malice, in stating that the law implies malice from a sudden, unprovoked killing and that in the absence of contrary evidence malice may be inferred from use of a deadly weapon, had the reversibly erroneous effect of suggesting to the jury that the prosecution need

[1] MCL 750.321; MSA 28.553.
[2] MCL 752.861; MSA 28.436(21).

not establish the necessary factual element of malice beyond a reasonable doubt. See *People v Wright,* 408 Mich 1; 289 NW2d 1 (1980). In view of the record evidence and the defendant's theory of the case, these instructional errors were prejudicial and likewise require reversal.

I

Defendant Jesse James Richardson, Jr. was convicted of first-degree murder[3] by a City of Detroit Recorder's Court jury on June 13, 1975. The Court of Appeals affirmed the conviction.[4] On reconsideration of an earlier order denying leave to appeal,[5] we granted leave to consider whether the trial judge's refusal of the defendant's request for certain lesser included offense instructions required reversal where the jury was instructed on other lesser offenses and returned a verdict of guilty on the highest, charged offense.[6]

The Court of Appeals summarized the testimony which was offered at the defendant's trial:

"On April 23, 1975, defendant was at the residence of Charles Johnson when an altercation arose between defendant and Marshall Cook, the brother of the decedent, Paul Cook. Marshall Cook testified that he beat defendant about the head with a brick in order to stop defendant from fighting another man. Defendant was cut badly and was bleeding profusely from two head wounds which ultimately required 22 stitches.

"Charles Johnson testified that he asked defendant if he could take him to a clinic for treatment. Johnson states he took defendant to the clinic but the defendant refused to stay long enough for medical treatment.

---

[3] MCL 750.316; MSA 28.548.

[4] *People v Richardson,* 77 Mich App 411; 258 NW2d 741 (1977).

[5] 403 Mich 845 (1978).

[6] 406 Mich 1008 (1979).

Johnson then took defendant home. Johnson states that when they arrived at defendant's home defendant got a box of shells and two rifles. Johnson observed defendant loading both rifles and getting a knife from a drawer. Linda Steen, defendant's common-law wife, then called defendant's father to request his assistance in taking defendant to the hospital. According to Johnson, defendant got on the phone and said to his father: 'I'm going to kill this mother fucker'. At this point Johnson left and told Marshall Cook to get off the street.

"At approximately 5:30 p.m., Miss Steen, her ten-year-old daughter Sonja, defendant and his father left for Deaconess Hospital. Defendant's father was driving. Defendant gave some amount of direction. Defendant had placed a rifle under the front seat of the car before leaving the house. His wife and father described him as being 'agitated' and uncommunicative.

"At approximately 6 p.m., as the car rounded a corner, defendant spotted Paul Cook, brother of his assailant Marshall Cook, and asked his father to stop the car. Paul was walking down the street, drinking a can of beer, in the company of one Glenn Spencer.

"Glenn Spencer, a good friend of the Cook family and a stranger to defendant, testified that defendant got out of the car and said to Paul, 'your brother just busted my mother fucking head'. Defendant then reached in the car for the rifle. Paul said he knew nothing about the beating. Defendant cocked the rifle and ejected an empty shell. Paul again said he had nothing to do with the beating. Defendant bent down to pick up the empty shell. As he arose he pushed Paul, who had approached him with his arms extended. Defendant then rapidly shot him twice. According to Spencer, Paul was facing the defendant when the first shot was fired. After the shot was fired, Paul fell backwards and was lying partially on his side when the second shot was fired. At no time did Paul turn his back on defendant. Spencer claimed to have seen the entire incident, although he began moving away as soon as he saw the rifle. By the time he heard the first shot he was two or three houses down the street. He said he never turned his back on the two men, but watched them as he trotted backwards down the street. He said the whole incident

occurred in half a minute or less. Further, just before the shots were fired Spencer heard someone in the car say, 'Jesse don't do that'.

"After the shooting, defendant got back in the car and left the scene. He proceeded to the hospital where he remained for several hours while his head wounds were treated. He then returned home. Defendant was arrested while cleaning up the dried blood from his own injuries.

"Defendant testified in his own behalf. His theory was that the shooting had been accidental. He testified that he had stopped to speak to Paul Cook because, although he and Marshall had never gotten along well, he and Paul were good friends. He wanted to tell Paul that he didn't intend to press charges, but that he wanted to talk to Marshall after they had 'gotten themselves together' about why Marshall would want to 'mess him up like that'. Defendant said that when he exited the car he and Paul got into an argument because Paul laughed about the head injuries as if they were a 'big joke'. The argument escalated into cursing and pushing. When Paul shoved him back towards the car the defendant pulled the gun out, butt end first. As he swung the rifle around Paul grabbed the barrel. The two men wrestled and the gun went off. Paul fell to the ground still holding onto the gun. Defendant pulled the gun away, got back in the car and left. He said he did not stop to check on Paul's injuries because he did not believe Paul had been shot. He also said that Glenn Spencer 'took off' when the gun first appeared." 77 Mich App 414-416.

To the foregoing account we would add that there was testimony that on the day of the killing, the defendant, while en route to the local employment security commission office and some time before his altercation with Marshall Cook, encountered the decedent Paul Cook and another man named Curt. A conversation occurred at that meeting, during which it was suggested that some beer be obtained for consumption by the three men.

The defendant told his two companions that he could not then indulge in any beer drinking because he was on his way to the "unemployment office". Later in the day, the defendant joined a group of persons at Johnson's house who were periodically pooling funds in order to purchase wine for the group's consumption. The defendant testified that after a while he decided to leave Johnson's, and after declaring that intention, he refused to contribute more change to the wine fund. It was then that Marshall Cook, after expressing a belief that the defendant had obtained some money at the "unemployment office", became agitated and beat the defendant. Defendant's testimony indicated that Marshall's belief that the defendant had some money was based on information obtained from Paul Cook. The prosecutor argues that the defendant apparently believed that Paul Cook had thus "set him up" for the beating administered by Marshall.

At the conclusion of the proofs, defense counsel requested the court to instruct the jury on the charged offense of first-degree murder only. The trial judge denied the request, and stated that he would instruct on first and second-degree murder, at least.[7] Defense counsel then requested the court to instruct on the additional lesser offenses of manslaughter[8] and reckless use of a firearm causing death or injury. The trial judge refused to instruct on reckless use of a firearm causing death or injury because he interpreted the information as not encompassing that offense. He did instruct

[7] See the later-decided *People v Jenkins,* 395 Mich 440; 236 NW2d 503 (1975).

[8] Our manslaughter statute does not define that offense, but instead incorporates the common-law definition. See *People v Stubenvoll,* 62 Mich 329, 331; 28 NW 883 (1886). There are two categories of manslaughter at common law: voluntary and involuntary. See *People v Carter,* 387 Mich 397, 418-419; 197 NW2d 57 (1972).

the jury on the offenses of first- and second-degree murder and voluntary manslaughter.

The jury returned a verdict of guilty of first-degree murder.

## II

The rule in Michigan has long been:

"Where a request has been to charge the jury on a lesser included offense, the duty of the trial judge is determined by the evidence. If evidence has been presented which would support a conviction of a lesser offense, refusal to give the requested instruction is reversible error but, in the absence of such a request, the trial court does not err by failing to instruct on the included offenses. *People v Jones,* 273 Mich 430; 263 NW 417 (1935)." *People v Phillips,* 385 Mich 30, 36; 187 NW2d 211 (1971).

Because the lesser offenses of involuntary manslaughter[9] and reckless use of firearms are not necessarily included lesser offenses, the rule of *People v Ora Jones,* 395 Mich 379, 390; 236 NW2d 461 (1975), requiring instructions on all necessarily included offenses without assessment by the court of the evidence, is not applicable. We therefore must first determine whether evidence was presented which would have supported conviction of either of the lesser offenses of involuntary manslaughter or reckless use of a firearm.

## A

We have said about the crime of involuntary manslaughter:

"The elements of involuntary manslaughter, although

---

[9] See *People v Van Wyck,* 402 Mich 266; 262 NW2d 638 (1978).

not completely exclusive of those found in voluntary manslaughter are distinguishable in several respects. They define a crime that originates out of circumstances often quite different from those found in voluntary manslaughter and apply to a defendant who did not proceed with the intent to cause death or serious bodily injury. In the leading case of *People v Ryczek,* 224 Mich 106, 110; 194 NW 609 (1923), the Court approved the following definition of involuntary manslaughter:

" ' "Involuntary manslaughter is the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty." '

"The usual situations in which involuntary manslaughter arise are either when death results from a direct act not intended to produce serious bodily harm, *People v Carter,* 387 Mich 397, 419; 197 NW2d 57 (1972); *People v Austin,* 221 Mich 635, 643-645; 192 NW 590 (1923); or when death results from criminal negligence. *People v Stubenvoll,* 62 Mich 329; 28 NW 883 (1886); *People v Townsend,* 214 Mich 267; 183 NW 177; 16 ALR 902 (1921)." (Footnote omitted.) *People v Townes,* 391 Mich 578, 590-591; 218 NW2d 136 (1974).

In the present case the prosecutor's theory was that the defendant, with premeditation, deliberation, and malice, intentionally killed Paul Cook. The defense case offered, in differing measures, ingredients of provocation, accident, self-defense, and "criminal" negligence of the kind that attends involuntary manslaughter.[10] Our review of the

---

[10] Defense counsel elicited, on direct examination, the defendant's version of the fatal encounter with Paul Cook:

"*Q:* What happened, what hospital were you going to?

"*A:* Deaconess.

"*Q:* You eventually got there later, didn't you?

"*A:* Yes.

"*Q:* On the way, you stopped somewhere, is that right?

"*A:* Yes.

"*Q:* Did you get out of the car?

"*A:* I got one foot out of the car, yes.

"*Q:* All right, why did you get out of the car at that time?

"*A:* I seen Marshall's brother, Paul Cook, and this other guy coming through the alley and at the time I was just sitting there and I seen them and I said, 'Wait a minute, daddy', I said, 'Wait', so he stopped and opened the door and got out of the car, one foot in and one foot out, leaning against the door. I called him, I called Paul Cook, I was going to run it to him that I wasn't going to talk to Marshall that when I get myself together and he get himself together, I wasn't going to press no charges against him down to the house or nothing. This was the purpose of me wanting to talk to him.

"*Q:* What happened when you saw his brother, Paul?

"*A:* He was coming to the sidewalk and we stopped, he come to the car, he was coming to the car as I got out.

"*Q:* Did you know him at this time from prior occasions?

"*A:* Paul Cook?

"*Q:* Yes.

"*A:* Yes, me and Paul Cook were good friends.

"*Q:* All right, what happened then?

"*A:* He got into a little argument.

"*Q:* What was the argument about?

"*A:* About him laughing and stuff, like it was a big joke to him about my head.

"*Q:* Now, did the argument result in any pushing and shoving?

"*A:* Yes.

"*Q:* What happened?

"*A:* When I cursed him, like he turned around and squared off on me, I said, 'Back off', just like that and as I touched him like that *(gesturing)* is when he shoved me and as I fell back, I drawed back because he had something in his hand and he drawed back like this *(gesturing)* and when he drawed back, I pulled the gun out.

"*Q:* What happened when you pulled the gun out?

"*A:* He stepped a foot back, I stepped back and as he pushed down into the car like this, I come out with the butt end of the gun like this *(gesturing)* and I was scringing it around, he grabbed it.

"*Q:* Did he get a hold of the gun?

"*A:* Yes, he grabbed the barrel of it, that's when he was pushing me, he swung and hit me in the chin.

"*Q:* Did this gun go off?

"*A:* Yes.

"*Q:* All right, at the time the gun went off, did he have his hands on it?

"*A:* Yes, it went off when we were wrestling."

In addition to this testimony, an apparently disinterested witness, Nancy Williams, testified that she observed the defendant and Paul Cook wrestling over the rifle. Defendant's common-law wife, who was present at the scene, stated that the two men were "tussling" before the gun went off. The defendant's daughter, who was also an eyewitness, stated that the two men wrestled for the gun.

record convinces us that there was evidence presented, as summarized above, which would have supported a conviction of involuntary manslaughter, and we therefore agree with the Court of Appeals that the trial judge committed error in refusing defendant's request for an instruction on that offense.

## B

The defendant's request for an instruction on the lesser offense of reckless use of a firearm was also refused. The statute involved announces this proscription:

"Any person who, because of carelessness, recklessness or negligence, but not wilfully or wantonly, shall cause or allow any firearm under his immediate control, to be discharged so as to kill or injure another person, shall be guilty of a misdemeanor, punishable by imprisonment in the state prison for not more than 2 years, or by a fine of not more than $2,000.00, or by imprisonment in the county jail for not more than 1 year, in the discretion of the court."

Here again, there was evidence presented which would have supported a conviction under this statute, and we therefore agree with the Court of Appeals that the trial judge erred in denying the defendant's request for an instruction on this offense.

## C

With respect to the trial judge's refusal to give the defendant's requested lesser offense instructions, the Court of Appeals said:

"Evidence was adduced in this case which would have

supported a finding of involuntary manslaughter or reckless use of a firearm. *People v Chamblis* [395 Mich 408; 236 NW2d 473 (1975)] at 423. Therefore, instructions on these lesser offenses should have been given. However, given that the jury refused to convict on the lesser offenses of second-degree murder or voluntary manslaughter, for which instructions were provided, we do not believe the error, under *Chamblis,* is reversible. *People v Herbert Ross,* 73 Mich App 588; 252 NW2d 526 (1977).

"In *Ross,* on finding no reversible error, we made the following comment:

" 'If the jury had doubts about defendant's guilt of the charged offense but believed him to be guilty of some wrongdoing they could have found him guilty of one of the lesser offenses. They did not do so. We must conclude, therefore, that the jury had no reasonable doubt as to the defendant's guilt of the charged offense.' 73 Mich App at 592.

"We see no reason to view the present case differently, and so decline to reverse here." 77 Mich App 421-422.

The question is thus presented as to whether the kind of instructional error which occurred in the present case can be rendered harmless by the jury's verdict of guilty on a higher offense where the option was available to convict on some lesser offense.

The doctrine of harmless error is stated in both court rule[11] and statute.[12] The essence of this doc-

---

[11] GCR 1963, 529.1 provides:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding shall construe these rules to secure the just, speedy, and inexpensive determination of every action so as to avoid the consequences of any error or defect in the proceeding which does not affect the substantial rights of the parties."

[12] MCL 769.26; MSA 28.1096 provides:

trine is that: "appellate courts should not reverse a conviction unless the error was prejudicial". *People v Robinson,* 386 Mich 551, 562; 194 NW2d 709 (1972). In the present case, we find it unnecessary to decide whether the harmless error principle can be applied generally to the kind of instructional error that occurred below, because even if such error could be harmless in some cases, it clearly was prejudicial here.

The defendant's testimony, and his case generally, attempted to demonstrate that Paul Cook died as a result of the accidental discharge of the firearm. The defendant admitted his presence at the scene and his participation in a physical struggle with the deceased which culminated in the fatal discharge of the defendant's rifle. His testimony, and other evidence, would have supported a finding by the jury that the fatal shot was the result of the defendant's careless, reckless, or negligent, but not wilful or wanton, mishandling of the rifle. Alternatively, there was evidence which would have supported a finding that the defendant's direct acts were not intended to produce serious bodily harm or that the death resulted from the defendant's criminal negligence. In essence, the defendant's theory was that he did not intend that any of his acts would produce serious bodily harm to Paul Cook.

The three offenses upon which the jury was instructed all involve activity which includes an intent to do great bodily harm or cause death. The

---

"No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

two offenses upon which the defendant's request for instructions was denied involve conduct which is careless, reckless, or criminally negligent, and results in injury or death.

Thus, the effect of the trial judge's refusal to instruct on the lesser offenses of involuntary manslaughter and reckless use of a firearm was to foreclose the jury's option to convict the defendant in accordance with his own testimony, evidence, and theory. In *People v Stephens,* 407 Mich 402, 406; 285 NW2d 664 (1979), in a similar context, we said:

"The Court has no interest in allowing a 'guilty' man to escape punishment. When a defendant admits criminal involvement, but not to the extent of the charged offense, the jury should have the 'freedom to act according to the evidence'. *People v Chamblis,* 395 Mich 408, 426; 236 NW2d 473 (1975). When the instructions the defendant requests relate to a cognate included offense and are supported by the evidence, they should be given."

In this case, the defendant's testimony, while perhaps not admitting criminal involvement, certainly would have supported conviction of the lesser offenses upon which the trial court refused to instruct. The jury was therefore denied the freedom to act according to the evidence, and moreover was deprived of any option to convict consistently with the defendant's testimony, evidence and theory.[13] Under these circumstances, the trial court's refusal to give the properly requested lesser offense instructions was prejudicial error and requires reversal.

---

[13] *Cf. People v Lester,* 406 Mich 252; 277 NW2d 633 (1979); *People v Hoskins,* 403 Mich 95; 267 NW2d 417 (1978); *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975).

### III

Another error occurred which we address so as to prevent its repetition on retrial.

The trial judge's instructions to the jury on the element of malice[14] included the following:

"The real test of malice is to be found in the presence or *[sic]* adequate cause of *[sic]* provocation to account for the homicide, the killing.·

"Possibly I can make that clearer by an illustration, if one without any cause inflicts a wrong upon another, we call him malicious; so when one, without any legal provocation, justification or excuse intentionally kills another, we call him a murderer. *The law implies from the unprovoked, unjustifiable or inexcusable killing, the existance [sic] of that wicked disposition which the law terms malice aforethought.*

"*If a man kills another suddenly and without provocation, the law implies malice and the crime is murder.* If the provocation is sufficient as must have greatly provoked him so that he acted from sudden passion, caused by some grave provocation, the killing would be manslaughter.

"The instrument with which the killing was done will be taken into consideration by you *because the intention to kill in the absence of evidence showing a contrary intent* may be inferred by *[sic]* the use of a deadly weapon in such a manner that death of the person assaulted by the weapon would be an inevitable consequence." (Emphasis supplied.)

---

[14] The term "malice", as a necessary element of murder, is defined:

"Malice aforethought is the intention to kill, actual or implied, under circumstances which do not constitute excuse or justification or mitigate the degree of the offense to manslaughter. The intent to kill may be implied where the actor actually intends to inflict great bodily harm or the natural tendency of his behavior is to cause death or great bodily harm." (Footnotes omitted.) *People v Morrin,* 31 Mich App 301, 310-311; 187 NW2d 434 (1971).

See, also, *People v Doss,* 406 Mich 90, 99; 276 NW2d 9 (1979); *People v Van Wyck,* 402 Mich 266, 269; 262 NW2d 638 (1978).

This Court long ago said:

"To give the homicide the legal character of murder, all the authorities agree that it must have been perpetrated with malice prepense or aforethought. This malice is just as essential an ingredient of the offense as the act which causes the death; without the concurrence of both, the crime can not exist; and, as every man is presumed innocent of the offense with which he is charged till he is proved to be guilty, this presumption must apply equally to both ingredients of the offense—to the malice as well as to the killing. Hence, though the principle seems to have been sometimes overlooked, the burden of proof, as to each, rests equally upon the prosecution, though the one may admit and require more direct proof than the other; malice, in most cases, not being susceptible of direct proof, but to be established by inferences more or less strong, to be drawn from the facts and circumstances connected with the killing, and which indicate the disposition or state of mind with which it was done. It is for the court to define the legal import of the term, malice aforethought, or, in other words, that state or disposition of mind which constitutes it; but the question whether it existed or not, *in the particular instance,* would, upon principle, seem to be as clearly a question of fact for the jury, as any other fact in the cause, and that they must give such weight to the various facts and circumstances accompanying the act, or in any way bearing upon the question, as in their judgment, they deserve: and that the court have no right to withdraw the question from the jury by assuming to draw the proper inferences from the whole, or any part of, the facts proved, as presumption of law. If courts could do this, juries might be required to find the fact of malice where they were satisfied from the whole evidence it did not exist." *Maher v People,* 10 Mich 212, 218 (1862).

See, also, *People v Martin,* 392 Mich 553, 560-562; 221 NW2d 336 (1974).

The portion of the instruction which stated that

*the law implies malice* "from the unprovoked, unjustifiable, or inexcusable killing" or when "a man kills another suddenly and without provocation" had the effect of withdrawing from the jury the essential factual issue of the existence of malice. The law, of course, does not imply malice from a sudden and unprovoked killing, and it was error to so instruct. The necessary factual element of malice may be permissibly inferred from the facts and circumstances of the killing, but it can never be *established as a matter of law* by proof of other facts. *Maher v People, supra; People v Martin, supra.*

This error was especially prejudicial in the instant case, since the defendant's evidence and theory included notions of accident, *i.e.*, that the *sudden* and *unprovoked* killing of Paul Cook was also *unintended* and *accidental.* It is apparent that even if the jury had chosen to accept much of the defendant's version of the fatal episode, they might have convicted the defendant of murder because the evidence established a sudden and unprovoked killing which, according to the court's instructions, was murder.

This error was compounded by the court's immediately subsequent statement that "[t]he instrument with which the killing was done will be taken into consideration by you because the intention to kill in the absence of evidence showing a contrary intent may be inferred by *[sic]* the use of a deadly weapon * * *".

In *People v Wright,* 408 Mich 1, 24-25; 289 NW2d 1 (1980), we declared the impermissibility of such potentially burden-shifting instructions:

"The vice of the instructions is thoroughly explained in an oft-quoted opinion in *Mann v United States,* 319 F2d 404, 409 (CA 5, 1963):

" 'When the words, "So unless the contrary appears from the evidence" were introduced, the burden of proof was thereupon shifted from the prosecution to the defendant to prove lack of intent. If an inference from a fact or set of facts must be overcome with opposing evidence, then the inference becomes a presumption and places a burden on the accused to overcome that presumption. Such a burden is especially harmful when a person is required to overcome a presumption as to anything subjective, such as intent or wilfulness, and a barrier almost impossible to hurdle results.'

"We are convinced that by instructing the jury that 'unless the testimony satisfies you of something else', the trial court created the prospect that the jury 'may have interpreted the judge's instruction as * * * a burden-shifting presumption', *Sandstrom [v Montana,* 442 US 510; 99 S Ct 2450; 61 L Ed 2d 39 (1979)], p 524, and the instruction is therefore unconstitutional." (Footnote omitted.)

As has been discussed, the main trial issue below was the defendant's state of mind, his intent. The defendant vigorously contested the question of whether his conduct at the time of the shooting was the product of an intent to kill, or do serious bodily harm to, Paul Cook. There was no controversy that the killing arose out of the "use of a deadly weapon" by the defendant, and little controversy that the killing was sudden and unprovoked. The above-discussed instructions, independently and in combination, had the potential of substantially diluting, and to some extent shifting, the prosecution's burden of proof beyond a reasonable doubt on the issue of malice (and intent, generally), to which the defendant's case was almost entirely directed. The erroneous instructions bore on the focal point of the trial. Upon review of the record, we are unable to say that the instructions in question were harmless error, and we

therefore additionally reverse the defendant's conviction on this ground. See *People v Wright, supra.*

## IV

In conclusion, we find that the trial judge's refusal to give the defendant's requested lesser offense instructions was prejudicial error on this record and requires reversal.

We also find that the trial judge's instructions on malice had the effect of taking the question of the factual element of malice from the jury, and additionally had the potential effect of shifting the burden of proof to the defendant, and that this error was likewise prejudicial on this record.

In view of our decision to reverse the defendant's conviction and remand this case for a new trial, it is unnecessary to reach the other issues raised.

Reversed and remanded.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with RYAN, J.