**Ernest ALEXANDER, Petitioner–Appellant,**

v.

**Dale FOLTZ, Respondent–Appellee.**

**No. 87–1003.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 30, 1987.

Decided Jan. 26, 1988.

Bret A. Schnitzer, Southfield, Mich., Daniel J. Melican (argued), Detroit, Mich., for petitioner-appellant.

Edgar L. Church (argued), Asst. Atty. Gen., Lansing, Mich., for respondent-appellee.

Before KEITH, MILBURN and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Put on trial by the State of Michigan, Petitioner was convicted of first degree murder for admittedly having shot and killed a man with whom he had been in a fight after the man made advances to Petitioner's wife. The central issue in the trial was Petitioner's state of mind at the time of the shooting; the State presented evidence tending to show premeditation and malice, and Petitioner presented evidence tending to show he had acted in the heat of passion, in self-defense, or both.

Several highly questionable instructions were included in the trial court's charge to the jury, including an instruction that "the law presumes every man intends the usual consequences which accompany his acts." Counsel for the State conceded, in oral argument before this court, that under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), there was error in the jury charge. (In *Sandstrom* the Supreme Court disapproved, on federal constitutional grounds, a state court instruction that said "[t]he law presumes that a person intends the ordinary consequence of his voluntary acts.")

Sentenced to life imprisonment, Petitioner applied for a writ of habeas corpus under 28 U.S.C. § 2254. The federal district court denied Petitioner's application, holding that any error in the jury instructions was harmless beyond a reasonable doubt.

We shall reverse the judgment of the district court; it seems to us that a rational juror could well have found, under proper instructions, that the State had failed to prove all the elements of first degree murder beyond a reasonable doubt. Lacking confidence that the jury's verdict would have been the same even with instructions that contained no error, we conclude that Petitioner is entitled to a new trial.

## I

The events out of which the criminal case arose occurred at a Detroit area racetrack on Friday, the 13th of June, 1975. Petitioner drove to the track shortly before the last race to pick up his 22-year-old wife, whom he had left there earlier in the evening. The woman was about three months pregnant.

Parking his car near the racetrack entrance, and leaving the couple's three-year-old son in the vehicle, Petitioner entered the area beneath the grandstand and spotted his wife looking at race results on a television screen. As he started walking toward her, Petitioner testified, three unknown men approached her, and one of them "snatched her by the arm." Petitioner evidently did not hear what was said, but his wife testified that the man asked her "Did you get the last race?" She shook her head and started walking off, as

she told the jury, whereupon the man stepped in front of her, grabbed her arm, and said "Why don't you come and help me spend some of this money I won?"

When Petitioner reached the group, according to his wife's testimony, he asked if the men were bothering her. Lacing his words with obscenities, the man who was holding her arm said "What is it to you?" Petitioner replied "That's my wife." Petitioner testified that the man responded "I don't care who she is" and started calling Petitioner "all types of names...."

Eyewitness accounts of what happened next contained some variations, but the jury could easily have concluded that the man knocked Petitioner to the ground one or more times and kicked him while he was down, breaking one of Petitioner's teeth; that Petitioner's wife swung her purse at the assailant; that one of the assailant's companions grabbed the wife around the waist and pulled her away; and that when Petitioner was able to regain his feet, he ran out to his car shouting "Be here when I come back," or "Just give me one minute!"

When he reached the car Petitioner opened the trunk and took out a loaded revolver that he claimed to have purchased for protection while driving a taxi. Thus armed, Petitioner testified, "I went back to look for my wife."

The evidence was in conflict as to when Petitioner's wife actually left the area where the fight occurred, but Petitioner testified that on his return he found her coming out the gate. The three men were apparently ahead of her, but Petitioner said he did not see them at first. His wife allegedly shouted "Look out," and Petitioner then saw the men coming toward him, the assailant in the lead. Petitioner testified that he told the man to stop, but "he rushed me and that's when I shot the gun." Petitioner said the man was about five feet away at the time of the shooting. According to the somewhat inarticulate account given by Petitioner on direct examination, "I told them to stop, you know, and he kept coming. I was pleading and I, you know, just shot it, you know, and like, you know, I mean I didn't mean to shoot

the guy. I ... [was] just trying to keep him from hurting me no more."

When asked on cross-examination why he had pulled the trigger, Petitioner testified as follows:

A. "I was mad, you know. Angry, you know, and I said, you know, guy come up on me, beat me and stomp me, you know, stomp me, teeth, mouth bleeding."

Q. "Did you intend to kill this man ... ?"

A. "No, sir."

The man's two companions had a different version of what happened immediately before the shooting; they said that Petitioner shook his gun in the assailant's face and shouted "Hey, what you gonna do now," while Petitioner's wife said "Shoot him, Ernest, shoot him," or "Go ahead, kill him, go ahead and kill him, go ahead and shoot him!" The wife denied having said anything of the sort, and Petitioner testified that he did not remember her saying anything. (The wife pleaded guilty to manslaughter prior to Petitioner's trial, and admitted then having told Petitioner to shoot; when she took the stand at Petitioner's trial, however, she claimed she had lied earlier because of the State's promise that she would not have to go to jail if her guilty plea were accepted. She needed to stay out of jail, she said, in order to care for her young son.)

Immediately after the shooting, Petitioner testified, his wife asked him about the baby in the car. She then went to the car, while Petitioner stayed behind. Petitioner testified that he became frightened, left the scene of the shooting, and was picked up by his wife in the car. A witness gave the license number to the police, and soon thereafter an officer spotted the car and pulled it over. Petitioner threw the gun out the car window before his arrest, but the police recovered the weapon the next day. Petitioner was brought to trial a few months later.

## II

After the jury had been impaneled, the prosecutor made an opening statement out-

lining the State's case and suggesting that the evidence would show beyond a reasonable doubt that Petitioner murdered the decedent "feloniously, deliberately, willfully, and with malice aforethought and premeditation...." (See Mich.Comp.Laws Ann. § 750.316, defining the crime of first degree murder in terms that include "any ... kind of wilful, deliberate and premeditated killing....") Counsel for Petitioner reserved his opening statement, contenting himself with a request that the court "instruct the jury that I don't have to prove anything...." The court gave such an instruction.

The prosecutor proceeded to call some 37 witnesses, and presentation of the State's case took approximately a week. Counsel for Petitioner, addressing the jury for the first time since it had been impaneled, then gave an opening statement that framed the main issue thus:

> "We'll bring out all the facts we know that happened there and then leave the matter in your hands for your determination as to what, if there was a homicide, the degree, or if there wasn't under the rules of evidence as Judge Roberts will describe them to you and *the matter will then be for you to decide whether or not John,[1] or Ernest Alexander had murder in his heart, whether he intended to kill anybody or not.*" (Emphasis supplied.)

With that, Petitioner was called to the stand; his testimony was followed by that of his wife. The State presented two rebuttal witnesses, after which Petitioner and his wife again testified briefly. Closing arguments followed.

The prosecutor presented a final argument that may fairly be described as concise, logical, and persuasive. Petitioner's counsel, who told the jury that he had been trying cases for more than 50 years, responded with a more discursive argument, summarizing the State's case in considerable detail and urging, again, that the State

had failed to prove that Petitioner "had murder in his heart."

Much of the ensuing jury charge was unexceptionable. After explaining that Petitioner was accused of having murdered the decedent feloniously, deliberately, willfully and with malice aforethought and premeditation, the court gave the following instructions on burden of proof and presumption of innocence:

> "The burden of establishing the proof of the case is upon the People, and in order to justify you as jurors rendering a verdict of guilty, it must be proven beyond a reasonable doubt that this Defendant has committed the offense charged here and at the time charged and as I have said to you, it is necessary for you to decide in your deliberations whether or not that has been shown beyond a reasonable doubt.

> "The Defendant in this case is presumed to be innocent of the charge brought against him here and that presumption of innocence abides with him throughout the entire trial of the case until he is proven beyond a reasonable doubt by the testimony given to be guilty of the charge brought against him. The mere fact that he is here on trial, that he has been arrested and brought into court should not be considered by you as in any way to raise a presumption that he is guilty."

This was followed by instructions on reasonable doubt, on the weight to be given the testimony of the accused, on the effect of Petitioner's prior criminal record, and on the use of circumstantial evidence.

The court next told the jury that the charges against Petitioner embraced three separate offenses, adding that "the law makes it mandatory that you be instructed as to the different elements which constitute each offense so you may determine the grade or degree of crime which was committed." (There was no objection to this suggestion that the shooting was necessarily criminous in some degree.) The

---

**1.** "John" was the name of the decedent; Petitioner's counsel not infrequently referred to Petitioner as "John" by mistake.

court went on to define murder as the willful and unlawful killing of a human being against the peace of the State, with malice aforethought, express or implied; the court explained the difference between first-degree murder and second-degree murder in terms of the presence or absence of premeditation.

After giving a definition of premeditation, the court defined manslaughter—the third offense embraced in the charging document—as the unlawful killing of one human being by another without malice, express or implied. An intentional killing might be without malice, the court explained, if brought about by some great provocation, "but it must be done while still in the heat of passion and before the passions have had time to subside and the blood to cool."

Turning to the definition of malice, the court instructed the jury as follows:

"The term malice as used in these definitions signifies a wrongful act done intentionally, without legal justification or excuse. The real test of malice is to be found in the presence or absence of adequate cause or provocation to account for the homicide. Possibly, I can make this clearer by an illustration.

If one without just cause inflicts a wrong upon another, we call him malicious so when one without any legal provocation, justification, or excuse, intentionally kills another, we call him a murderer. *The law implies from an unprovoked, unjustifiable or unexcusable killing, the existence of that wicked disposition which the law terms malice of forethought [sic]. If a man kills another suddenly and without provocation, the law implies malice and the offense is murder.* If the provocation is such as must have greatly provoked him so that he acted from sudden passion caused by some great provocation, the killing would be manslaughter. The instrument with which the killing was done may be taken into consideration because the intention to kill, in the absence of evidence showing a contrary intent, may be inferred from the use of a deadly weapon in such

a manner that the death of the person assaulted would be the inevitable consequence.

A pistol is within the class of things the law defines to be a dangerous or deadly weapon.

*The law presumes every man intends the usual consequences which accompany his acts but it is the claim of the Defendant in this case that what he did was in self-defense and that the deceased was the aggressor.* Now, there are occasions when a killing of one person is excusable homicide. The only such occasion with which you are concerned here is the extent to which a man may go and defend himself under attack." (Emphasis supplied.)

After lengthy and detailed instructions on self-defense, the court ended its charge by telling the jury that there were four possible verdicts: "Guilty of murder in the first-degree or murder in the second-degree or manslaughter or not guilty."

When the jury had retired, the court asked if counsel were satisfied with the instructions. Petitioner's counsel responded as follows:

"I followed your instructions, Your Honor. I can't find anything to add. I think that you did—pardon me for not standing. I am old—touch upon the presumption of innocence and attach it to the Defendant, did you say that?
THE COURT: I did.
[PETITIONER'S COUNSEL]: And reasonable doubt, I'm sure. I believe your honor touched all bases."

After the jury had deliberated a little over an hour, it sent the court a message requesting certain exhibits, plus the testimony of eight named witnesses and "a copy of Judge's definition of manslaughter, second degree murder, [and] self-defense. . . ." In response to this request the court told the jury it would receive the exhibits and the definitions; explaining that no transcripts of testimony had been prepared, however, the court asked the jury to rethink its request for the testimony. The jury then retired for the night and was given the requested instructions and

exhibits at 9:00 a.m. the next day. At 11:15 a.m. the jury returned with its verdict ("Guilty as charged, first degree murder"), having sent the court the following message earlier in the morning: "After reading in detail the definitions of crimes, we feel we do not need any testimony as requested...."

## III

The conviction was appealed to the Court of Appeals of Michigan, where appellate counsel raised a single claim of error having to do with the provenance of the gun. By way of supplemental briefs filed *in propria persona*, Petitioner raised three additional claims of error, one of which was that there was insufficient evidence to warrant submission of the first degree murder charge to the jury. Although it acknowledged "a degree of sympathy for Defendant, who committed this murder after receiving a severe beating at the hands of the man who had accosted his pregnant wife," the Michigan court rejected these claims of error—properly, in our view—and affirmed the conviction in an opinion reported at 76 Mich.App. 71, 255 N.W.2d 774 (1977). The Supreme Court of Michigan denied review. *People v. Alexander*, 402 Mich. 826 (1977).

Several years later, after a petition for federal habeas corpus relief had been denied, the Michigan Court of Appeals granted an application for a second appeal. In his second appeal Petitioner contended that "the trial court erred by instructing the jury that the law implies malice from an unprovoked, unjustifiable or inexcusable killing." The Michigan Court of Appeals agreed that there had been instructional error in this respect, but held that the error "was harmless beyond a reasonable doubt, because defendant admitted the killing, but argued that it was justified by the necessity of self-defense."

Citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), Petitioner also contended in his second appeal that the trial court had erred "by instructing the jury that the law presumes that every man intends the usual consequences which accompany his acts." The Michigan Court of Appeals agreed that such an instruction was forbidden in *Sandstrom*, but held, in reliance on *People v. Woods*, 416 Mich. 581, 331 N.W.2d 707 (1982), *cert. denied*, 462 U.S. 1134, 103 S.Ct. 3116, 77 L.Ed.2d 1370 (1983), that *Sandstrom* was not to be applied retroactively. "Moreover," the court held, "any error in giving this instruction was harmless beyond a reasonable doubt on this record, because defendant admitted intentionally shooting the victim." The Michigan Supreme Court denied review for a second time, and Petitioner then instituted his second federal habeas corpus proceeding. Claims of instructional error loom large in the second habeas petition.

Because Petitioner had sought a writ of habeas corpus in a prior federal proceeding, the present case might have been dismissed under Rule 9(b) of the Rules Governing Section 2254 Cases if the district judge had found that Petitioner's failure to assert his instructional error claims in the prior petition constituted an abuse of the writ. The district court did not make such a finding, however, and elected to address the merits of the petition.

Comparing the passage where the Michigan trial court had charged that "If a man kills another suddenly and without provocation, the law implies malice and the offense is murder" with the language disapproved in *Sandstrom* ("[t]he law presumes that a person intends the ordinary consequences of his voluntary acts"), the district court declared that

> "[t]he instruction given in the matter at bar may be differentiated from the erroneous one in *Sandstrom*, for the trial court herein did not imply that a presumption of malice arose from Petitioner's acts. Instead, he charged that malice may be implied by the accused's conduct and the type of weapon used."

The district court evidently overlooked the portion of the Michigan trial court's charge stating that "The law presumes every man intends the usual consequences which accompany his acts...." In any event, the district court concluded that "any error in jury instructions, which were [sic] attenuat-

ed by the court's charge that the burden of proof on the element of malice remained with the prosecutor, was harmless beyond a reasonable doubt." The writ was denied.

## IV

■ We need not dwell at length on the question whether the Michigan trial court's charge contained error of constitutional dimension. Echoing the conclusion of the Michigan Court of Appeals, counsel for the State has conceded that it did.

The concession is hardly surprising. The key portion of the Michigan trial court's instruction on the element of malice did not vary by so much as a jot or a tittle from the instructions considered by the Supreme Court of Michigan in *People v. Richardson*, 409 Mich. 126, 293 N.W.2d 332 (1980). Speaking for a unanimous court in *Richardson*, Justice Ryan—who is now a judge of this court—said of this common-form jury charge that

"[t]he portion of the instruction which stated that *the law implies malice* 'from the unprovoked, unjustifiable, or inexcusable killing' or when 'a man kills another suddenly and without provocation' had the effect of withdrawing from the jury the essential factual issue of the existence of malice. The law, of course, does not imply malice from a sudden and unprovoked killing, and it was error to so instruct. The necessary factual element of malice may be permissibly inferred from the facts and circumstances of the killing, but it can never be *established as a matter of law* by proof of other facts." 409 Mich. at 143–44, 293 N.W.2d at 340 (citations omitted, emphasis in original).

In *Cook v. Foltz*, 814 F.2d 1109, 1111 (6th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 1109, 98 L.Ed.2d 77 (1987), similarly, this court, speaking through Judge Keith, said this of the self same charge:

"There is little question that the instruction ... was *Sandstrom* error. The state carries the burden of proving every element of a criminal offense beyond a reasonable doubt and any jury instruction that shifts the burden is a violation of due process. *Sandstrom*, 442 U.S. at

523, 99 S.Ct. at 2459; *In re Winship*, 397 U.S. [358] at 364, 90 S.Ct. [1068] at 1072–1073 [25 L.Ed.2d 368 (1970)]."

The portion of the charge in which Petitioner's jury was told that "[t]he law presumes every man intends the usual consequences which accompany his acts ..." cannot be differentiated, on any meaningful basis, from the corresponding portion of the charge condemned by the United States Supreme Court in *Sandstrom*. This "presumption" charge is particularly troublesome in the case at bar because of the fact that immediately after saying that "[t]he law presumes every man intends the usual consequences which accompany his acts," the court added "but it is the claim of the Defendant in this case that what he did was in self-defense and that the deceased was the aggressor." By ignoring, at this point, Petitioner's claim that he acted in the heat of passion and without premeditation, the court may very well have given the jury to understand that if the claim of self-defense were rejected, the State would be entitled to the benefit of a legal presumption on the basis of which Petitioner could be found guilty of a more serious offense than the State would have been able to prove without the presumption.

Considering all of the challenged instructions in the context of the charge as a whole, and viewing them against the background of the particular evidence presented to the jury and the particular issues that the jury was called upon to decide in this case, we are satisfied that the instruction cannot pass constitutional muster. And as this court declared in *Cook v. Foltz*, 814 F.2d at 1111,

"The fact that the *Sandstrom* error occurred before the *Sandstrom* decision is of no consequence. *Sandstrom* has full retroactive effect in this circuit 'since the instructional error would normally affect a defendant's right to a fair trial and impact upon the ultimate issue of innocence or guilt.' *Conway v. Anderson*, 698 F.2d 282, 284 (6th Cir.), *cert. denied*, 462 U.S. 1121, 103 S.Ct. 3092, 77 L.Ed.2d 1352 (1983). *See also McBee* [*v. Grant*,

763 F.2d 811 (6th Cir.1985) ]; *Williams v. Engle,* 683 F.2d 152 (6th Cir.1982); *Krzeminski v. Perini,* 614 F.2d 121 (6th Cir.), *cert. denied,* 449 U.S. 866, 101 S.Ct. 199, 66 L.Ed.2d 84 (1980)."

■ The case at bar is not one in which we need be concerned with the question whether there was good cause for the failure of Petitioner's counsel to make a timely objection to the jury charge, or the question whether Petitioner was prejudiced thereby, or the question of cause and prejudice in connection with the failure to assert instructional error in the initial appeal. See *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Unlike *Cook v. Foltz,* where the denial of habeas relief was affirmed on the ground that the defendant's failure to make any contemporaneous objection gave the Michigan appellate courts an unassailable procedural basis for affirmance of the conviction on direct appeal, the present case is one in which the Michigan Court of Appeals waived the procedural defect, allowed a second appeal, and addressed the underlying constitutional question on the merits. Under these circumstances, we are obliged to do likewise.

**V**

■ As the Michigan Court of Appeals recognized, a conclusion that the jury instructions were tainted with *Sandstrom* error would avail Petitioner nothing if the error should be found, beyond a reasonable doubt, to have been harmless. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). The Michigan court decided that the error was in fact harmless beyond a reasonable doubt, both "because defendant admitted the killing, but argued that it was justified by the necessity of self-defense," and "because defendant admitted intentionally shooting the victim." The district court, stressing "the overwhelming evidence of petitioner's premeditation and deliberation in this case," agreed. Unlike the district court, we are not overwhelmed by the evidence of pre-

meditation and deliberation, and we think the trial record discloses ample room for doubt that the error was harmless.

It is important, we believe, not to lose sight of the fact that a finding that Petitioner was guilty of murder in the first degree was not the only rational alternative open to the jury once it decided that Petitioner had not acted in self-defense. Had it not been for the erroneous instructions it received from the trial court, the jury, it seems to us, could well have found that although Petitioner did not act in self-defense, the State nonetheless failed to establish beyond a reasonable doubt that he acted with "malice aforethought and premeditation."

Absent a finding of malice, the jury could not properly have found Petitioner guilty of anything more than manslaughter. Absent a finding of premeditation, Petitioner could not properly have been convicted of a crime more serious than murder in the second degree. That Petitioner admitted pulling the trigger did not of itself establish either malice or premeditation. That Petitioner's act was not justified by a need to defend himself did not establish malice or premeditation either. Even though Petitioner did not act in self-defense, it is entirely possible that Petitioner shot the decedent without having "murder in his heart," as Petitioner's counsel repeatedly urged upon the jury—and we can have no way of knowing how the jury would have decided that question in the absence of instructions suggesting that the State could carry its burden of proof through a presumption implied by law.

Here, as in *Francis v. Franklin,* 471 U.S. 307, 325–26, 105 S.Ct. 1965, 1977, 85 L.Ed.2d 344 (1985), the facts did not "overwhelmingly" preclude the jury from finding in the defendant's favor on the question of his actual state of mind. Here, as in *Francis v. Franklin,* it cannot be said that the evidence was "so dispositive of intent that a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption." *Id.* at 326, 105 S.Ct. at 1977, quoting *Connecticut v. Johnson,* 460

U.S. 73, 97 n. 5, 103 S.Ct. 969, 983 n. 5, 74 L.Ed.2d 823 (1983) (Powell, J., dissenting). And here, just as in *Francis v. Franklin*, "[t]he jury's request for reinstruction on the elements of malice ... lends further substance to the ... conclusion that evidence of intent was far from overwhelming in this case." 471 U.S. at 326, 105 S.Ct. at 1977.

In *Burton v. Foltz*, 810 F.2d 118, 121 (6th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 327, 98 L.Ed.2d 354 (1987), this court, speaking through Judge Milburn, noted that

> "[a]pplication of the harmless error standard permits the reviewing court to uphold the conviction *only* if it 'may *confidently* say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' *Delaware v. Van Arsdall,* [475] U.S. [673], 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *see Merlo v. Bolden,* 801 F.2d 252, 257 (6th Cir. 1986)." (Emphasis supplied.)

The particular facts of *Burton v. Foltz* justified a measure of confidence in the jury's verdict, notwithstanding the instructional error, that would be unwarranted here. The facts of the present case more closely resemble those of *Merlo v. Bolden,* 801 F.2d 252 (6th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1358, 94 L.Ed.2d 527 (1987). There, acknowledging that "the mere fact that [petitioner] disputed the element of intent is not dispositive," we concluded that "the evidence is in such a balanced state that we cannot say beyond a reasonable doubt that it 'was so dispositive of intent ... that the jury would have found it unnecessary to rely on the presumption' created by the erroneous *Sandstrom* instructions." *Id.* at 257, quoting *Connecticut v. Johnson,* 460 U.S. at 97 n. 5, 103 S.Ct. at 983 n. 5 (Powell, J., dissenting).

The evidence in the case at bar is at least as evenly balanced as it was in *Merlo.* In that case the petitioner, a full two months before he shot and killed his estranged wife, had "slapped her a couple times," breaking her glasses; one month before the homicide he had smashed the dashboard of her car with a gun, leaving a bullet on the seat. The decedent in the present case, in contrast, was a total stranger to Petitioner. The decedent might well have been found to have accosted Petitioner's wife and given Petitioner a severe beating, in her presence, while she was being held by one of the decedent's companions. Whether or not Petitioner's wife urged him to shoot, Petitioner's response is surely as likely to have been a truly spontaneous act as was Mr. Merlo's killing of his estranged wife.

This is far from saying, of course, that Petitioner was in fact innocent of first degree murder, or that without the erroneous instructions the jury would not have found him guilty of first degree murder. It probably does Petitioner's trial counsel no injustice to suggest that he may have been facing, in the prosecutor who tried this case for the State, an advocate more skillful than himself—and whatever Petitioner's actual state of mind may have been, it is entirely possible that the jury would have concluded, regardless of what the trial court said in its charge, that Petitioner really did have murder in his heart. It is also possible that such a finding would have been correct. In this country, however, we try not to incarcerate people for life on the basis of possible guilt; guilt must be established beyond a reasonable doubt.

We assume that the jury in this case listened to the trial court's instructions carefully. That assumption is strengthened by the fact that the jury asked for a copy of the pertinent portion of the charge and, after reading it "in detail," withdrew its request for portions of the testimony. The jury may well have decided it did not need the testimony because it could find the elements of first degree murder on the basis of legal presumptions that have now been held not to exist.

On the record before us, we simply cannot allow Petitioner's first degree murder conviction to stand. The judgment of the district court is REVERSED, and the case is remanded with instructions to issue a writ of habeas corpus providing for Peti-

tioner's release from incarceration unless the State of Michigan elects to retry Petitioner within 90 days of the date of the district court's order.