## PEOPLE v CUTCHALL

Docket No. 137791. Submitted October 7, 1992, at Grand Rapids.
Decided June 22, 1993, at 10:05 A.M. Leave to appeal sought.

Rex D. Cutchall, charged with second-degree murder, was con-
victed by a jury in the St. Joseph Circuit Court, James P.
Noecker, J., of voluntary manslaughter. He then pleaded guilty
of being an habitual offender, third offense, and was sentenced
to twenty to thirty years' imprisonment. The defendant ap-
pealed by leave granted, claiming that evidence of his flight
from Michigan was admitted in error and that his sentence was
disproportionate.

The Court of Appeals *held:*

1. Evidence of a defendant's flight from the scene of a crime
is admissible at trial if it is relevant and material. In this case,
evidence of the defendant's flight was relevant to consciousness
of guilt, and its probative value was not outweighed by the
danger of unfair prejudice.

2. The introduction of evidence of the defendant's flight did
not force him to introduce evidence of a prior conviction for
unarmed robbery. The defendant introduced that evidence as a
matter of strategy to explain that he fled because he knew he
would be accused of the homicide in light of his criminal
record.

3. There was sufficient evidence to convict the defendant of
voluntary manslaughter.

4. The sentence imposed does not violate the principle of
proportionality. Although the sentencing guidelines do not
apply to habitual offenders, the sentence in this case was
within the guidelines, and a sentence that is within the guide-
lines is presumptively not excessively severe or unfairly dispa-
rate.

Affirmed.

NEFF, J., concurring in part and dissenting in part, stated
that were it not for the precedent set by *People v Buck,* 197
Mich App 404 (1992), which held that a conviction of voluntary

REFERENCES
Am Jur 2d, Evidence §§ 280, 1128.
See ALR Index under Criminal Law; Evidence Rules.

manslaughter may be upheld despite a lack of evidence to support it where there was sufficient evidence to convict of a greater offense and the defendant requested a jury instruction on voluntary manslaughter, the defendant's conviction of involuntary manslaughter should be reversed on the basis of insufficiency of evidence. In addition, the admission of evidence of the defendant's flight requires reversal because the probative value of that evidence was outweighed substantially by its prejudicial effect.

CRIMINAL LAW — EVIDENCE — FLIGHT.

Evidence of a defendant's flight from the scene of a crime is admissible at trial if it is relevant and material; such evidence should be admitted with caution, however, where its probative value is slight in light of the other evidence presented in the case, and evidence of flight alone should be insufficient to warrant conviction.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Jeffrey C. Middleton,* Prosecuting Attorney, for the people.

*Milton J. Marovich,* for the defendant on appeal.

Before: GRIFFIN, P.J., and NEFF and CORRIGAN, JJ.

CORRIGAN, J. Defendant was charged with second-degree murder, MCL 750.317; MSA 28.549, stemming from the stabbing death of Cathern Young, the aunt of his estranged wife. Following a jury trial, defendant was convicted of the lesser included offense of voluntary manslaughter. MCL 750.321; MSA 28.553. Defendant subsequently pleaded guilty of being an habitual offender, third offense, and was sentenced to twenty to thirty years in prison. Defendant now appeals by delayed leave granted, and we affirm.

I. ROLE OF EVIDENCE OF FLIGHT FROM THE SCENE OF THE CRIME

Defendant initially contends that the trial court

committed error requiring reversal in allowing the prosecutor to introduce evidence that he fled the State of Michigan following the victim's death, especially because admission of this evidence forced him to impeach himself with his prior record. We disagree.

Michigan recognizes the equivocal nature of evidence of flight; however, evidence of flight is generally relevant and admissible. In *People v Cipriano,* 238 Mich 332, 336; 213 NW 104 (1927), our Supreme Court observed:

> It is true that "flight from the scene of a tragedy may be as consistent with innocence as with guilt;" but it is always for the jury to say whether it is under such circumstances as to evidence guilt.

Despite this broad statement in *Cipriano,* other decisions of our Supreme Court make it difficult to determine precisely what role evidence of flight plays in a criminal case. In *People v Clark,* 124 Mich App 410; 335 NW2d 53 (1983), this Court attempted to harmonize these decisions and determine the proper role of such evidence. The panel's analysis in *Clark* is extensive and worth quoting in its entirety:

> Defendant claims that evidence of his flight from the crime scene was improperly admitted as substantive evidence of his guilt. We disagree. In *People v Cismadija,* 167 Mich 210, 215; 132 NW 489 (1911), our Supreme Court stated that a jury may not consider flight as substantive evidence of criminal guilt. The Court later stated that evidence of flight might be considered as evidence of guilty knowledge (of possession of liquor), although it was not substantive evidence of guilt and was not itself sufficient to warrant a conviction. *People v Burbank,* 234 Mich 600, 604; 208 NW 687 (1926). The Court next stated that flight may be as consis-

tent with innocence as with guilt; although it is not substantive evidence of guilt, it might bear on a defendant's purpose and intent. *People v Mac-Cullough*, 281 Mich 15, 29; 274 NW 693 (1937). In its only lengthy discussion of the issue, the Court said that evidence of a defendant's flight was admissible although it was "of itself no evidence of guilt." *People v Cammarata*, 257 Mich 60, 66; 240 NW 14 (1932).

We think that the Supreme Court's opinions on this subject, while seemingly contradictory, can be reconciled. The term "substantive evidence," as used by the Court in *Cismadija, Burbank,* and *MacCullough,* obviously had a far narrower meaning than it has today. The Court's statements indicated that evidence of flight could be evidence of purpose, intent, or knowledge, all now considered "substantive" matters. We believe it can no longer be said that flight is not admissible as substantive evidence. Evidence of flight is admissible where relevant and material. Such evidence should be admitted with caution, however, where its probative value is slight in light of the other evidence presented in the case. Furthermore, evidence of flight alone may remain insufficient to warrant conviction. *Burbank, supra,* p 604. [*Id.* at 413-414.]

## II. REVIEW OF TRIAL COURT RATIONALE FOR ADMISSION

In the present case, the evidence of flight consisted of testimony that, immediately following the crime, defendant fled to Jacksonville, Florida, where he was arrested eleven days later. The evidence also showed that defendant had assumed the alias "Robert Kline," which he gave at the time of his arrest.

In ruling this evidence admissible, the trial court found the evidence relevant to the issue of

defendant's state of mind and its probative value sufficient to withstand any challenge under MRE 403. The court stated:

> Given the fact that the defense in this case is alibi, that is to say that defendant didn't commit this crime, is distinguished from the defense that while the defendant committed certain acts, the acts do not constitute the crime charged but some lesser offense or indeed justified or excused by self-defense, the evidence of flight is relevant to the consciousness of the guilt.
>
> One of the dangers in allowing this kind of evidence, that it is equally interpretable as evidence of panic, but if the defense is that the defendant did not commit the crime it is difficult to understand how he might have flown into a panic.
>
> Subsequently, I conclude both based on the authorities I have reviewed as well as the logic of the matter, such evidence can be, with Court's discretion of course, admissible to show evidence of consciousness of guilt as one facet of the defendant's state of mind.
>
> In this particular case, in addition to flight there is also the further evidence that the defendant attempted to conceal his identity which makes the evidence even more probative, it seems to me, and when not getting into the 403 argument in this issue, I would conclude it is strongly relevant and would easily survive a 403 type challenge.
>
> Subsequently, I conclude that the evidence should be admitted and that the instruction requested, which is 401, is appropriate. Defendant's motion with respect to this particular evidence is, therefore, denied.

The trial court did not err in admitting this evidence. The instruction given by the court concerning the use of evidence of flight was accurate. Specific authority supports the court's conclusion

that such evidence is admissible to show consciousness of guilt. See, e.g., *People v Stull,* 127 Mich App 14, 18-19; 338 NW2d 403 (1983), and CJI2d 4.4. The circumstantial nature of the evidence does not render the evidence inadmissible pursuant to MRE 403.

We draw no adverse conclusions because the proofs were circumstantial. There is no real distinction between circumstantial and direct evidence; sometimes circumstantial evidence can be more compelling than direct evidence. It is not a less worthy class of evidence; intrinsically, it is not different from testimonial evidence. *Holland v United States,* 348 US 121; 75 S Ct 127; 99 L Ed 150 (1954). In any event, any concern about the circumstantial nature of the proofs was dissipated because defendant explicitly testified that he was innocently present at the crime scene. The jury, for good and sound reasons, ultimately rejected his exculpatory claim.

Nor can we say that the jury gave too much weight to the evidence of flight. Many facts, apart from defendant's flight, point ineluctably to his guilt beyond a reasonable doubt. Decades ago, Professor John Henry Wigmore described in his classic exposition of "Conduct as Evidence of Guilt" many of the guilty behaviors exhibited by defendants. See 2 Wigmore, Evidence (Chadbourn rev), §§ 273-276, pp 115-132. Guilt leaves varieties of psychological marks on human beings, which Wigmore termed "consciousness of guilt." See generally 1A Wigmore (Tillers rev), § 173, p 1840 and 2 Wigmore (Chadbourn rev), §§ 266-283, pp 97-187. Applying Wigmore's categories, defendant's flight becomes part of a seamless web of evidence that a rational trier of fact could employ to find the elements of the crime proven beyond a reasonable doubt.

A. THE MAN WHO KNEW TOO MUCH: WIGMORE, § 273

Defendant Cutchall knew too much. Of all the crime-scene witnesses, he alone knew immediately that the victim had been murdered. Wigmore quotes *Moore v State,* 2 Ohio St 500, 504 (1853), where it was recognized:

> "From our knowledge of the human mind and its workings, we expect, with almost positive certainty, that when it is the sole repository of so dreadful a secret, it will affect the conduct and sayings of the person; hence the mind naturally looks to these with the most anxious scrutiny, and would require for its satisfaction, if such a thing was possible, a complete transcript of the person's conduct and sayings. . . . Sometimes a person is detected as the author of a crime by showing an unusual anxiety to discover the perpetrator; at other times the discovery is led to by the person showing too much indifference. *In some instances, the observation that the person appears to know too much about the transaction leads to the discovery;* at other times the inquiry is started by his appearing to know too little. These are generally acts that in themselves show no disposition to do mischief; but it is because they are unnatural, because they tend to the conclusion that they are produced by a mind conscious of its guilt, that they are provable against the accused. They are in themselves nothing, except as showing the state of mind of the party." [2 Wigmore, *Evidence,* § 273, p 116; emphasis added.]

Cathern Young, the victim, and her husband, Claude, had been married thirty-two years. They lived quietly in Centreville, Michigan. The victim's mother, Ethel Dragger, had lived with them for six years. Defendant, married to but separated from the victim's niece, had been allowed to live in the Youngs' basement for a year. Defendant had lost

his job recently and spent the day of the crime in various bars, consuming about twenty beers before 4:00 P.M. Cathern came home from work about 4:00 P.M. She went to the basement to wash a load of laundry and obtain some potatoes for supper. The victim's husband had worked that day, came home after 3:00 P.M., and fell asleep on an upstairs sofa after ingesting a half pint of whiskey.

The victim's seventy-eight-year-old and apparently infirm mother first heard the six-foot-five-inch, 215-pound defendant "clunk" down the stairs. She could not fix an exact time, but knew she had been talking to her niece on the telephone when she heard Cathern scream. Defendant immediately ran up the stairs and said, "Cathern's fallen, call an ambulance."

The victim was a very small woman with low blood volume. Because of the bent-up position of her body after she had been stabbed five times in the back, she apparently bled into her chest cavity. Hence, only a small amount of her blood was visible at the crime scene. Some had pooled under her body, but no one who saw the blood associated it with murder—except the defendant. Not until her body was finally uncovered and rolled over in the hospital emergency room did anyone discover that Cathern Young had been stabbed repeatedly.

The victim's mother, cousin, and husband, emergency medical service personnel, and fire and police officers—a parade of witnesses—viewed her body in the laundry room. Not one had the slightest inkling that she had been murdered. How, then, did defendant know immediately that Cathern Young had been the victim of foul play? How was it obvious to him—and no one else—that the victim had been murdered and that he would be accused of the crime?

Defendant testified that he arrived in the base-

ment and saw Cathern lying on her left side. He did not know what had happened to her. He claimed he dragged her body across the floor and placed it in its bent-up position next to the washing machine. As he did so, some of Cathern's blood got on his hand. Defendant immediately leaped to the conclusion that the victim had been murdered, and that he would be falsely accused of the crime, so he fled. This hidden fact was glaringly apparent to the defendant for one reason—he had a guilty heart. The jurors could have weighed defendant's obvious falsehood in assessing his guilt, completely apart from the evidence of his flight.

### B. "CATHERN'S FALLEN - CALL AN AMBULANCE"

WIGMORE, § 281(2). FALSEHOOD, FRAUD, FABRICATION AND SUPPRESSING EVIDENCE: EXPLAINING AWAY THE SUSPICIOUS CONDUCT

Defendant also exhibited "Wigmorean" behavior just after the crime. He falsely told the victim's mother that the victim had fallen down; the mother's niece also overheard defendant make this statement. Their testimony about defendant's statement is corroborated by EMS records of the incoming telephone report at 5:03 P.M. that a woman had fallen down and was unconscious at the Young home. Defendant denied ever having made any such statement. We credit the prosecution's witnesses on this factual dispute. In reviewing the evidence, our function is to draw all factual inferences, where conflict arises, in favor of the prosecution. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992).

Why would defendant lie about this detail? This statement shows his intent to conceal the commission of the crime for as long as possible—another

manifestation of his consciousness of guilt. See, generally, 2 Wigmore, *supra,* § 281(2).

The medical examiner rebutted defendant's contention that he had dragged Cathern Young's body across the laundry room floor. No evidence supported defendant's testimony that the body had been moved or dragged across the floor. The body did not show any evidence of bruising or drag marks, nor were there any tracks on the floor. What blood there was had pooled under the body, next to the washing machine. The jury properly rejected defendant's testimony in favor of the prosecution's rebuttal testimony.

### C. ESCAPE TO THE SUNBELT: WIGMORE, § 276(4).
### FLIGHT, ESCAPE, RESISTANCE, OR CONCEALMENT

Defendant's next Wigmorean behavior was his flight from Centreville to Florida, where he stayed eleven days until he was arrested. Defendant had lived in a room in the basement next to the laundry room for over a year. He suddenly left Centreville with his belongings in disarray in his basement room.

### D. WIGMORE, § 273(1). CONDUCT IN GENERAL;
### DEMEANOR WHEN CHARGED OR ARRESTED

Upon his arrest in Florida, defendant exhibited another variety of Wigmorean conduct—he concealed his identity. When defendant was arrested, he gave the name "Robert Kline." He then told the arresting officers that he could be extradited to Michigan only if they could prove he was Rex Cutchall.

Officers then seized the knife that defendant habitually possessed. The knife, which was consistent with the stab wounds on the decedent's body,

had traces of blood on it, but too small an amount to be identified as human. (None of the other knives seized from the home and tested had any blood on them.) Defendant had been seen with his knife on the very day of the murder.

### III. INJECTION OF DEFENDANT'S PAST CRIMINAL RECORD

We reject defendant's argument that he was compelled to testify about his past criminal record because of the court's adverse rulings on his motions. To make his case believable, defendant had to explain that his prior criminal record made him fear that he would be accused of Cathern Young's murder. This is not compulsion, but a reasonable strategic choice created by the need to explain damning physical evidence. Whatever the outcome of the trial court's rulings on his motions, defendant had to justify the presence of his bloody (latent) palm prints on the washing machine in the laundry room next to the victim's body.

Defendant chose to interpose his unarmed robbery conviction (his arson conviction had already been excluded) as a matter of trial strategy:

> *Mr. Kleidon [defense attorney]:* May it please the Court, the decision to have the defendant testify as to his prior record was a conscious one, both Mr. Cutchall and myself agonized over the decision. We won't know if we were right until the jury comes back with its verdict.
>
> I sat and agonized over the advantages and disadvantages of placing that in the record, you know, as the Court alluded to, the fact that it does give a legitimate explanation as to his flight to Florida but it also then creates the problem of the jury knowing that he has a prior criminal record.
>
> It's one of those situations where we're damned if we do and damned if we don't. And we had to

make our decision and I pray it's the best one that we could make.

May I inquire just briefly of Mr. Cutchall of the fact that we did discuss that?

*The Court:* Please.

*Mr. Kleidon:* Mr. Cutchall, you've heard me tell the Court as to your testimony as to your prior criminal record, is that correct?

*Mr. Cutchall:* Yes.

*Mr. Kleidon:* And did in fact we discuss your testimony and the specific point at whether or not we were going to introduce your prior criminal record on numerous occasions?

*Mr. Cutchall:* Yes.

*Mr. Kleidon:* And do you feel satisfied that we adequately and fully discussed the advantages and disadvantages of placing that into evidence?

*Mr. Cutchall:* Yes, I do.

*Mr. Kleidon:* And was it in fact your—were you in agreement with me in placing that into evidence?

*Mr. Cutchall:* Yes.

### IV. SUFFICIENCY OF EVIDENCE

None of the facts in isolation suffices to convict the defendant. The jury was entitled to weigh all the facts in discharging its truth-seeking function. Proof of defendant's guilt was a seamless web; we cannot conclude that the jury gave too much weight to the evidence of flight to the exclusion of other evidence of guilt.

Certain behavior of some of the witnesses is troubling; for example, they failed to summon an ambulance promptly after the crime. Moreover, the amount of life insurance on the victim had recently been increased.

Although the failure to summon an ambulance is troubling, that failure can be explained. When

the victim's mother heard Cathern scream and was told by defendant to call an ambulance, she hung up the phone and became agitated. She could not locate the telephone number for the ambulance. She looked for Cathern's address book, but could not find it. She then telephoned her niece, who lived five minutes away, and sought her assistance. During this interval, she and the victim's husband also went down to the basement and observed the unconscious victim. When the niece arrived, she also checked the body and then immediately placed a call to the sheriff's department. Her call was logged in at 5:03 P.M. Both the victim's mother and the husband watched television until help arrived, but the mother testified she did this to "straighten out her nerves."

Although defendant questions the possible role of the victim's husband in this case, we reject the invitation to retry the case on appeal. The victim and her husband had been married for thirty-two years. The husband, apparently a functioning alcoholic, had been steadily employed for forty-one years. He had no prior criminal record, "not even a traffic ticket." Why didn't the husband assist in summoning help more quickly? We glean that he had completed only the fourth grade and could not read. How could he locate telephone numbers in any phone book?

As to the recent increase in insurance coverage to $67,000, the bulk of it—at least $40,000—had been in place since 1967. Both the husband's brother, who handled the couple's financial affairs, and the husband testified that the husband did not know the amount of the life insurance policies on the victim. We engage in speculation in concluding that the husband knew the amount.

In any event, the possibility of the husband's participation in the murder was fully aired before

the jury. They did not accept that theory. No one knows why Cathern Young was cruelly murdered; the motive for the crime lies buried with her. The evidence suffices to convict defendant beyond a reasonable doubt of the apparent compromise verdict of voluntary manslaughter.

As noted in Judge NEFF's opinion, the present record is devoid of any evidence of provocation or heat of passion sufficient to mitigate second-degree murder to voluntary manslaughter. Applying *People v Buck,* 197 Mich App 404; 496 NW2d 321 (1992), we decline to recognize this appellate parachute. Defendant successfully persuaded the trial court to instruct on the lesser offense and now argues on appeal that the evidence supporting the requested lesser included offense is insufficient. In this case, the instructions conference was unrecorded. We are left to guess at the reasons the defendant sought the lesser charge. Defense counsel concededly requested the instruction on voluntary manslaughter.

Lastly, we reject defendant's final contention that his sentence was disproportionate. Although the sentencing guidelines do not apply to habitual offenders, *People v Sanders,* 163 Mich App 606, 612; 415 NW2d 218 (1987), the trial court must compute the guidelines for the underlying offense. *People v Finstrom,* 186 Mich App 342, 345; 463 NW2d 272 (1990). Here, the trial court adopted the sentencing information report prepared by the probation officer in the case, utilizing the second edition of the sentencing guidelines. The trial court's computations under the guidelines indicated a recommended range of six to ten years for the minimum sentence. The trial court sentenced defendant to twenty to thirty years' imprisonment.

A measure of proportionality in the sentencing of habitual offenders is the similarity between the

degree of sentence enhancement authorized by the Legislature and the increase of the minimum sentence beyond the upper end of the guidelines' recommendation for the underlying offense. *People v Williams,* 191 Mich App 685, 686; 479 NW2d 36 (1991).

Defendant was eligible to receive a sentence that was twice as great as the statutory maximum for the underlying offense. MCL 769.11; MSA 28.1083. Thus, the minimum sentence imposed on defendant, as enhanced because of his third-felony offender conviction, was within the sentencing guidelines range. Sentences that fall within the guidelines' range are presumed to be neither excessively severe nor unfairly disparate. *People v Broden,* 428 Mich 343, 354-355; 408 NW2d 789 (1987); *People v Tyler,* 188 Mich App 83, 85; 468 NW2d 537 (1991). Although a sentence that is within the guidelines' range can conceivably violate proportionality in unusual circumstances, *People v Milbourn,* 435 Mich 630, 661; 461 NW2d 1 (1990), it is not true in the instant case.

Affirmed.

GRIFFIN, P.J., concurred.

NEFF, J. *(concurring in part and dissenting in part).* I take issue with the majority opinion on two bases. First, I find that there was insufficient evidence to convict of voluntary manslaughter and would reverse and remand for entry of a judgment of not guilty of that charge were it not for the holding of *People v Buck,* 197 Mich App 404; 496 NW2d 321 (1992), which will be discussed *infra.* Second, I find that admission of the evidence of flight constituted prejudicial error requiring reversal.

I

The facts of this case are somewhat unusual and the evidence against defendant was not by any means overwhelming. As pointed out in the majority opinion, the case against defendant was strictly circumstantial. There was no testimony at trial to suggest any motive for defendant to kill the victim, nor was there any testimony of any bad blood between the two.

The actions of the victim's husband and mother, who were in the house at the time she was killed, add to the aura of uncertainty about the events that led to the victim's death.

The victim's mother was on the telephone when she heard her daughter scream from the basement. Instead of investigating immediately, she continued to talk for a short time on the telephone and did not go to the basement until defendant went upstairs and told her that an ambulance should be called. She then went to the basement and observed the victim, but did not attempt to give any assistance. She returned to the telephone, but was unable to find the phone number for the ambulance. She then called her husband's niece and asked her to come over to give assistance.

While waiting for the niece to arrive, the mother did not return to the basement to check on her daughter, but sat and watched television.

The victim's husband, who claims to have been asleep, gave conflicting stories about what awoke him. He initially told the police that it was his mother-in-law's scream that awakened him, but then later testified that it was his wife's scream from the basement that roused him from his nap. He, too, went to the basement, observed his wife, and failed to offer or attempt any assistance to her. He waited upstairs for his niece's arrival, not

in the basement where his wife lay dying. The majority suggests that his inability to read precluded him from locating phone numbers to call for help. However, he had no explanation for his failure to go to a neighbor or get in his car and drive for help.

When the niece arrived, she went immediately to the basement, where she determined that the victim had no pulse. She felt at that point that the victim was dead, but she went immediately back upstairs and telephoned the sheriff's department for assistance.

The sheriff's department sent an ambulance, and the attendants attempted to revive the victim. Oddly enough, they did not, discover the five knife wounds in the victim's back from which she had bled to death. It was not until the victim was taken to the hospital that these wounds were discovered in the emergency room. It was at this point that hospital personnel notified the sheriff's department. The sheriff's department then contacted the husband, who had remained at home when his wife was taken to the hospital. In fact, the husband did not even learn of his wife's death until some time later that night after law enforcement officers investigated the scene of the crime and he went to the police department to answer questions. He then went to his brother's home.

II

During the course of the trial, defense counsel consistently urged the jury to return a verdict of not guilty of the charge of second-degree murder. He did not ask for or suggest a conviction of the lesser offense of voluntary manslaughter in argument, it was not a part of his theory of defense, and there is no indication in the lower court

record of any request by defense counsel for an instruction on voluntary manslaughter. The portion of the trial transcript covering the postinstruction discussions between the trial court and counsel includes a brief mention by the trial court that defendant requested an instruction on the lesser offense of voluntary manslaughter in chambers, but there is no transcript of the in-chambers conference involving jury instructions. The suggestion in the majority opinion that defendant "successfully persuaded" the trial court to instruct on voluntary manslaughter is an editorial comment not supported by the record.

Voluntary manslaughter is distinguishable from the crime of murder and is a cognate lesser included offense of murder. *People v Pouncey,* 437 Mich 382, 388; 471 NW2d 346 (1991). The components of voluntary manslaughter are that the defendant must kill in the heat of passion caused by an adequate provocation and without a lapse of time during which a reasonable person could control his passions. The killing must be intentional. *Id.,* p 388; *People v Townes,* 391 Mich 578, 589; 218 NW2d 136 (1974). While provocation need not be proven by the prosecution beyond a reasonable doubt, there must be some evidence of provocation in order for the instruction on voluntary manslaughter to be given. *People v Moore,* 189 Mich App 315, 320; 472 NW2d 1 (1991).

A

The record before us is totally devoid of any evidence or testimony suggesting provocation or heat of passion. It was clear legal error to instruct the jury on the offense of voluntary manslaughter. Defendant did not move for a directed verdict on the charge of voluntary manslaughter, but our

failure to review the issue would clearly amount to manifest injustice because the evidence provides no support whatsoever for a conviction of that charge.

Although the record reflects the trial court's remark that defense counsel requested an instruction on voluntary manslaughter during in-chambers discussion of jury instructions, I find an insufficient basis on which to refuse to review this issue. As noted in *Moore, supra,* p 319:

> At a criminal trial, the judge functions both as a neutral arbiter between the two contesting parties and as the jury's guide to the law. This role requires that the judge instruct the jury regarding the law applicable to the case, MCL 768.29; MSA 28.1052, and fully and fairly present the case to the jury in an understandable manner. *People v Jones,* 419 Mich 577, 579; 358 NW2d 837 (1984). The fulfillment of this obligation requires that the judge instruct on included offenses where there is a request to do so and where there is evidence in the record which would support a conviction of the lesser offense. *People v Richardson,* 409 Mich 126, 135; 293 NW2d 332 (1980); *People v Ora Jones,* 395 Mich 379, 386; 236 NW2d 461 (1975). When no evidence exists to support a conviction of a lesser-included offense, an instruction with regard to a lesser-included offense detracts from, rather than enhances, the rationality and reliability of the fact-finding process. *People v Beach,* 429 Mich 450, 481; 418 NW2d 861 (1988).

In order to support an instruction on a lesser included offense, "[t]here must be some evidence on the record to support the elements of the requested lesser included (cognate) offense." *Beach, supra,* p 480.

While there might have been a request to instruct on voluntary manslaughter by the defense

in this case, there clearly is no evidence in the record to support a conviction of that lesser offense. It was the obligation of the trial court to refuse a request to instruct on an offense totally unsupported by any testimony or evidence in the record.

B

In *Buck, supra,* a panel of this Court held that a conviction of voluntary manslaughter may be upheld despite the lack of evidence to support it where there was sufficient evidence to convict of a greater offense and the defendant requested a jury instruction on voluntary manslaughter. *Buck, supra,* pp 419-423. The *Buck* panel concluded that the evidence against Franklin C. Geick, a defendant in the *Buck* case, was insufficient to support a conviction of voluntary manslaughter. However, in refusing to reverse Geick's conviction of voluntary manslaughter, the *Buck* panel relied on past decisions of this Court that allowed an aider and abettor to be convicted of a crime lesser than that committed by the principal, foreign authority, and on Geick's request for an instruction on voluntary manslaughter. The *Buck* panel put significant emphasis on the fact that there was considerable evidence in the record from which to conclude that Geick was guilty of aiding and abetting first-degree murder.

The evidence presented against defendant is far less compelling than the evidence presented against Geick in the *Buck* case. While the circumstantial evidence against defendant in this case might arguably support a second-degree murder conviction, the evidence was relatively unimpressive. Defendant was in the basement when the victim screamed, and he went upstairs and told

the victim's mother to call an ambulance. His bloody palm print was found in the basement. However, he explained during his own testimony that he found the victim lying on the floor and lifted her up to prop her against the wall. When he removed his hand from her back, it was covered with blood. He then placed his hand against one of the appliances to steady himself and thereby left the bloody palm print. When defendant was arrested in Florida, the police found a knife that contained traces of blood, but scientific testing did not establish whether the blood was human or animal.

While these facts might be sufficient evidence for a rational trier of fact to conclude that defendant committed second-degree murder, they do not, as the facts against the defendant in the *Buck* case did, constitute strong evidence that defendant committed the greater charged offense. I disagree with the conclusion reached in *Buck* on the basis of the reasoning of *Beach, supra,* and *Moore, supra.* Because I must follow the holding in *Buck* under Administrative Order No. 1990-6, 436 Mich lxxxiv, and Administrative Order No. 1991-11, 439 Mich cxliv, and extended by Administrative Order No. 1992-8, 441 Mich cxi, I acknowledge that reversal cannot be based on the fact that the evidence was insufficient to support a conviction of voluntary manslaughter, but follow *Buck* only because of the requirements of the administrative order.

Because there was insufficient evidence to convict of voluntary manslaughter, I would reverse and remand for entry of a judgment of not guilty of that charge were it not for the holding of the *Buck* case.

III

Defendant's contention that the trial court com-

mitted error requiring reversal in allowing the prosecutor to introduce evidence that he fled the State of Michigan following the victim's death is persuasive.

A

The probative value of evidence of flight is inherently questionable. In *Wong Sun v United States,* 371 US 471, 483-484, n 10; 83 S Ct 407; 9 L Ed 2d 441 (1963), the United States Supreme Court observed the following with regard to such evidence:

> Although the question presented here is only whether the petitioner's flight justified an inference of guilt sufficient to generate probable cause for his arrest, and not whether his flight would serve to corroborate proof of his guilt at trial, the two questions are inescapably related. Thus it is relevant to the present case that we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime. In *Alberty v United States,* 162 US 499, 511 [16 S Ct 864; 40 L Ed 1051 (1896)], this Court said:
>
> ". . . it is not universally true that a man, who is conscious that he has done a wrong, 'will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right and proper;' since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.' "

See also *Hickory v United States,* 160 US 408;
[16 S Ct 327; 40 L Ed 474 (1896)]; *Allen v United
States,* 164 US 492; [17 S Ct 154; 41 L Ed 528
(1896)]; *Starr v United States,* 164 US 627 [17 S Ct
223; 41 L Ed 577 (1897)]; and for the views of two
Courts of Appeals see *Vick v United States,* 216
F2d 228, 233 [(CA 5, 1954)]. ("One motive is about
as likely as another. Appellant may be guilty, but
his conviction cannot rest upon mere conjecture
and suspicion"); cf. *Cooper v United States* [94 US
App DC 343, 345; 218 F2d 39 [(1954)]. ("After all,
innocent people caught in a web of circumstances
frequently become terror-stricken"). But cf. *United
States v Heitner,* 149 F2d 105 [(CA 2, 1945)].

**B**

My review of the ruling to admit the evidence of
flight constrains me to conclude that the ruling
was in error. I am mindful that the instruction
given by the trial court on the use of that evidence
was accurate, and that there is specific authority
to support the court's conclusion that such evi-
dence is admissible to show consciousness of guilt.
See e.g., *People v Stull,* 127 Mich App 14, 18-19;
338 NW2d 403 (1983), and CJI2d 4.4. Nevertheless,
given the completely circumstantial nature of the
case against defendant, coupled with the equivocal
nature of the evidence of flight, I believe that the
trial court erred in failing to exclude the evidence
pursuant to MRE 403.

Defendant is an ex-felon, whose prior convictions
were ruled inadmissible for purposes of impeach-
ment. Nevertheless, defendant was compelled to
testify about his prior convictions after the trial
court ruled that evidence of flight would be admit-
ted:

*Q. [Defense counsel]:* Why did you just leave the

Young household [after finding Cathern injured and apparently dead in the laundry room]?

*A. [Defendant]:* Because I was scared.

*Q.* Why, Rex, were you scared?

*A.* Because I was afraid I'd be arrested.

*Q.* Why?

*A.* Mainly because of my priors.

*Q.* By "priors" what do you mean?

*A.* Prior convictions I had.

*Q.* Did you go to prison before?

*A.* Yes, I had.

*Q.* When?

*A.* I went in '77, in December.

*Q.* What was that for?

*A.* Unarmed robbery.

*Q.* And how long did you stay in prison?

*A.* I was in prison for six years.

*Q.* And when did you get out?

*A.* I believe it was in April of '83, but I'm not quite sure of that.

Central to my holding is the nature of the case against defendant. While I am not prepared to say that the evidence at trial was insufficient to support a finding that defendant did in fact kill Cathern Young, I am prepared to say that the circumstantial case against him was far from airtight. Although defendant was seen emerging from the basement where Cathern's body was found, no one saw him stab her and unlike the victim's husband, he had no motive to kill her.

The majority strains to speculate that defendant had a "guilty heart" because his discovery of blood when he moved the victim led him to believe that foul play was involved and that he would be blamed. I conclude quite the opposite. Any reasonable person in similar circumstances would almost certainly conclude that the victim had met with something other than an accident. As a convicted

felon, he knew immediately that he would be a suspect and that his prior record would impair seriously his credibility.

Furthermore, the actions of the other individuals in the home following the discovery of Cathern's body—including Cathern's husband, who collected over $67,000 on a recently increased life insurance policy—appear quite strange. I am particularly troubled by the failure of these individuals to summon an ambulance promptly after hearing the victim scream and being told by defendant to do so.

Of course, these matters were before the jury and it was entirely within its province to assess the weight of all the evidence in determining defendant's guilt or innocence. I emphasize the above points, however, to highlight the unfair prejudice that resulted from admitting the evidence of flight. What was admitted ostensibly for the limited purpose of showing "consciousness of guilt" in all likelihood became the pivotal fact that tipped the scales in favor of a guilty verdict.[1]

C

In short, I refuse to uphold a conviction where on review of the record I am persuaded that the verdict might have rested upon evidence that may be "as consistent with innocence as with guilt." *People v Clark*, 124 Mich App 410; 335 NW2d 53 (1983). Under the circumstances of this case, the probative value of the evidence of flight was substantially outweighed by the danger of unfair prejudice. Consequently, the evidence should have been excluded pursuant to MRE 403. For these

---

[1] Indeed, I agree with defendant that the jury's compromise verdict of voluntary manslaughter rather than second-degree murder suggests a lingering uncertainty regarding whether he was the killer.

reasons, I would reverse defendant's conviction of voluntary manslaughter.

As noted in § II of this opinion, the present record is totally devoid of any evidence of provocation or heat of passion sufficient to mitigate murder to manslaughter. Were it not for *Buck, supra,* I would reverse on the basis of sufficiency of the evidence, and instruct the trial court, on remand, to enter a judgment of acquittal if evidence in support of the elements of voluntary manslaughter is not adduced.